**NATIONAL LABOR RELATIONS BOARD**
**v. TIMES–PICAYUNE PUB. CO.**

No. 10084.

Circuit Court of Appeals, Fifth Circuit.

June 12, 1942.

Robert B. Watts, Gen. Counsel, National Labor Relations Board, and Ernest A. Gross, Associate Gen. Counsel, National Labor Relations Board, both of Washington, D. C., and C. Paul Barker, Regional Atty., National Labor Relations Board, of New Orleans, La., for petitioner.

Esmond Phelps, of New Orleans, La., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

McCORD, Circuit Judge.

.The National Labor Relations Board seeks enforcement of an order issued

by it against The Times-Picayune Publishing Company, a Louisiana corporation engaged at New Orleans in the publication of The Times-Picayune, a morning newspaper, The New Orleans States, an afternoon newspaper, and The New Orleans Times-Picayune-States, a Sunday newspaper. The daily publications have a combined circulation in excess of 175,000, and the Sunday publication has a circulation in excess of 180,000. Respondent is subject to the provisions of the National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 159 et seq. N. L. R. B. v. Express Publishing Co., 5 Cir., 111 F.2d 588; N. L. R. B. v. Hearst, 9 Cir., 102 F.2d 658.

Several months prior to May 20, 1940, International Typographical Union sought to unionize the composing room employees of The Times-Picayune Publishing Company. On being apprised of this intention, the officers and agents of the Company met with a representative of the Union and agreed that a consent election would be held to ascertain whether the Union should in the future represent the composing room employees for the purpose of collective bargaining. The Company also caused the following notice to be posted in the composing room: "That they (the employees) are free to become members or refrain from becoming members of the International Typographical Union and no employee will be discriminated against because of membership or activity in that organization."

As the time for holding the election approached, much agitation and confusion occurred in the composing room between the employees, and at the request of the Union, additional notices were posted prohibiting employees of the composing room from discussing "union or non-union membership while on duty". The notice failed to have the desired effect and, after conferring with the Labor Board's Regional Attorney, the Company posted another notice prohibiting conversations between employees during working hours about matters having nothing to do with the work assigned to them. The election was held on May 20, 1940, and the Union lost by a vote of sixty to forty-six. No contest or protest was made as to the result or as to the fairness of the election.

In October, 1940, on complaint of the International Typographical Union, the National Labor Relations Board issued its complaint against the Publishing Company charging it with unfair labor practices under Section 8(1) of the Act in that it had interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed in Section 7; and that it had discriminatorily terminated the employment of Albert P. Stoddard, a linotype operator, and Thomas I. O'Connor, a composing room employee, in violation of Section 8(1) and (3) of the Act.

The usual proceedings were had, and after a hearing findings of fact and conclusions of law were entered by the Board. The Board found that within the meaning of Section 8(1) the respondent had interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed to them by Section 7; and that the discharge of Stoddard was an unfair labor practice within the meaning of Section 8 (3). It found that O'Connor had refused to obey reasonable orders; that he was disrespectful to his superior when cautioned about his derelictions; and that his discharge was warranted and not in violation of Section 8(3).

The Board ordered the respondent to cease and desist from discouraging membership in the Union or any other labor organization by discharging and refusing to reinstate any of its employees or in any manner discriminating in regard to their hire and tenure of employment; and from interfering with, restraining, or coercing its employees in the exercise of their rights to self-organization, and other rights guaranteed in Section 7. It ordered that Stoddard be offered immediate and full reinstatement to his former position without prejudice to his seniority or other rights and privileges, and to make him whole for any loss of pay which he had suffered by reason of his discharge. The respondent was further ordered to post appropriate notices of compliance.

The Publishing Company does not deny that it gave instructions to its foremen to ascertain how the employees stood with reference to the Union. This was in direct conflict with its promise not to intermeddle with its employees with regard to unfettered self-organization, and their right to organize, join, and belong to a union without interference from the employer. It further appears that a foreman of the composing room called on several employees at their homes in an effort to discourage them from voting for the Union. The evidence in the record is consistent

with and supports the Board's finding that the respondent engaged in unfair labor practices within the meaning of Section 8(1) by interfering with the employees' exercise of the rights guaranteed by Section 7 of the Act.

The employee Stoddard was discharged early in the morning on June 3, 1940, some two weeks after the date of the election. Much of the acrimony and bitterness found in the backwash of the election was caused by the employees joking with each other, and was not the result of the conduct of officers of the company. On May 31, 1940, after working hours, Stoddard and four or five of his fellow employees foregathered in a saloon and spent the entire night drinking. About six o'clock the following morning Stoddard and a companion, Albert J. Lewis, went to Stoddard's home where they continued drinking. About 9:30 that morning Stoddard, who was due to report to work at 10:15 a. m., telephoned the office of The Times-Picayune, and spoke to James Powers, his foreman, who was then on duty. Powers testified as to what transpired over the telephone: "Mr. Stoddard called me up, I think it was around 9:30, and he apparently was drinking very heavily, and he said he was not coming to work, and I saw he was drunk, or apparently he spoke like he was drunk, and I tried to talk him out of it, and I said, 'What do you mean Pat, you are not coming in?' He said, 'You know how things are around there. I am so damned mad I am just not coming in to work.' I said, 'What do you want to do that for? Why don't you just call in sick, or have your wife, Mildred, call in sick, and ask to get off, or just ask to get off? We don't have a lot of copy, and you could get off.' Pat said, 'No, I don't want that.' He was just not coming to work, and he wanted to stay off, and he wanted to make an issue of it, and wanted to see what would happen, and I tried to save Pat's job for him. I like Pat very much, and I always did, but still, he would not. I tried to save his job, and did not report the incident to Mr. Baker until almost an hour afterward. I tried to find out some manner in which I could protect Stoddard and still do my duty to the office."

It is further without dispute that Stoddard said he wanted "to stick his neck out"; that he wanted to take pressure off other Union employees; that he wanted to show them some courage. He cursed Baker, his superintendent and called him a vile name;

"You know how I feel about that * * * I am fed up on things, and I am not coming to work." Powers appealed to Stoddard's wife and to his friend Lewis to aid him in saving Stoddard's job, but they said they could do nothing. Powers had in many instances used his efforts to save the jobs of employees who were drunk, but in every instance they had asked to get off. Stoddard wanted it distinctly understood that he did not want to request to get off, and that he was not calling to get permission to get off. He wanted to make an issue of it, and to see what would happen. Stoddard was not so drunk but that he knew what he was doing.

Baker, the superintendent who discharged Stoddard, testified: "No, I did not testify that he was fired because he did not report on time for work, and I did not testify that he was fired because he had cursed me. That was not the whole reason. The reason that Stoddard was discharged was because he refused to request to get off. He refused absolutely to request to get off, and if I had let him get by with that, why, I would never have been able to maintain discipline in the office. I had something that never came up before. I never had a man who refused; I have had a lot of them say they could not come in, but Pat was offered an opportunity to get off, and he refused to accept it, and he created a situation which had never before been created in the composing room to my knowledge, since at least I have taken charge, and I had never heard of one previous to my trusteeship of the composing room."

■ Stoddard, his wife, Powers, Lewis, and the superintendent, Baker, all knew that Stoddard was making and creating a situation so that a test could be made. Moreover, he expected to be fired. He telephoned Powers, the foreman, and asked if he should come back to work, and when he was discharged he did not ask for the reason; he already knew the reason, for he deliberately created the situation which he knew must lead to his discharge. Not one shred of substantial evidence can be dredged up from the record to show that he was discharged because of his union affiliations, or that his discharge was for the purpose of discouraging membership in the Union. He was a good linotype operator, he was needed in the composing room, but he alone is responsible for the discharge. The evidence does not support the finding

that his discharge was discriminatory within the meaning of Section 8(3) of the Act. Associated Press v. N. L. R. B., 301 U.S. 103, 132, 57 S.Ct. 650, 81 L.Ed. 953; N. L. R. B. v. Jones & Laughlin Steel Corp., 301 U.S. 1, 57 S.Ct. 615, 81 L.Ed. 893, 108 A.L.R. 1352; Stonewall Cotton Mills, Inc., v. N. L. R. B., 5 Cir., June 3, 1942, 129 F.2d 629; N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433.

The portion of the Board's order requiring reinstatement of Stoddard with back pay and seniority rights is not supported and is set aside. Except as the order relates to reinstatement of Stoddard it is enforced.

Modified and enforced.