**NATIONAL LABOR RELATIONS BOARD
v. GOODYEAR TIRE & RUBBER CO. OF
ALABAMA.**

No. 10138.

Circuit Court of Appeals, Fifth Circuit.

July 6, 1942.

Robert B. Watts, Gen. Counsel, National Labor Relations Board, Ernest A. Gross, Associate Gen. Counsel, and Mortimer Kollender, Asst. Gen. Counsel, all of Washington, D. C., for petitioner.

J. C. Inzer, Frank J. Martin, O. R. Hood, and Roger C. Suttle, all of Gadsden, Ala., and Forney Johnston, of Birmingham, Ala., for respondent.

James B. Allen, of Gadsden, Ala., for intervener.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

On May 26, 1937, Etowah, a local labor organization denied recognition by respondent as sole bargaining agent, filed its petition with Mr. Feidelson, Regional Director, for an election to determine its right to such representation. The next day, Uni-

ted,[1] a nationally affiliated labor organization filed against respondent, charges of unfair labor practices. An amended charge and a complaint were filed August 3, and thereafter the proceedings out of which this petition grows, dragged their slow length along until on May 4th, nearly 5 years afterwards, the petition for enforcement came on for hearing here. The taking of evidence, filling 8,000 typewritten pages was concluded December 1, 1937. On September 6, 1938, there was a Board order that no intermediate report be issued by the trial examiner but that proposed Findings of Fact, Conclusions of Law, and Order, should be filed instead. These, detailed and voluminous, were filed October 25, 1939, and on March 9, 1940, the equally voluminous final decision and order was filed. On December 1, 1941, the Board filed its petition for enforcement, respondent thereafter filed its answer, the local labor organization, Etowah, intervened, and on May 4th, the hearing came on here. Calling this state of the record to our attention, respondent appealing to the record itself and moving also to take testimony in support, insists, in limine; that both the proposed and the final findings of fact and conclusions of law were written by persons disqualified by prejudice, partisanship and bias; that respondent has been thereby denied due process; and that the findings and order should be set aside and the record re-referred to the Board as now constituted for new and unprejudiced findings. In addition it insists; that because of elapsed time between complaint and order there is now no relation whatever between them; that the order has become obsolete; and for that reason too, it should be set aside and the proceeding remanded to the Board to bring the evidence down to date and make the appropriate order.

On the merits, as to the discharges and layoffs found to have constituted unfair labor practices, and the provisions of the order requiring reinstatement and back pay, respondent vigorously insists that there is no evidence to support the findings and that the order may not stand. On the merits as to the finding that Etowah is dominated, interfered with or supported by the company, and the order that it be dis-

established as representative, while both Etowah and respondent insists that there is no evidence to support them, the respondent, interested mainly in the orders requiring reinstatement with back pay, while pointing out that it refused to recognize Etowah unless and until in an election it was certified by the Board, devotes little of its brief or argument to them. Etowah however, as the labor organization really affected by the order, vigorously contests the findings and order as wholly unfounded and as doing a great injustice to the employees, in effect, depriving them of their guaranteed statutory right of self-organization, and choice of their own representative.

We make short shrift of the preliminary objection by respondent to the findings and order as prejudiced, of its motion to take testimony, and of its request that because of the unfair hearing, the matter be sent back for redecision by the Board as now constituted, by saying that no case for such action is made out. This is so first, because under settled law, Cf. N. L. R. B. v. Lane Cotton Mills, 5 Cir., 108 F.2d 568, the motion does not present a case for the taking of additional evidence. It is so second, because a careful study of the findings convinces us that they were not as charged by respondent, drawn with a partisan and prejudiced view, exhibiting a fell purpose and design to sweepingly and without examination, determine every charge of the complaint against respondent. They were, instead, drawn in a painstaking and conscientious effort to carefully canvass and separately dispose of every issue raised by the complaint, some [2] of them in respondent's favor, some in favor of the Board. Further if we could agree with respondent that to the extent that the findings and order were against it, they were not only incorrectly but unfairly found, we should still deny its request for a return of the case for redecision upon the record. For a careful study of it shows that it is without substantial conflict as to the material facts upon which the decision of each tendered issue turns, and that what the ultimate findings should be, is, as to each issue, except one, the discharge of Parker, to be

---

[1] There was testimony not denied that Feidelson, Regional Director, with whom Etowah's committee had conferred about the election, had stated to the United's committee, that as long as Etowah had a majority of Goodyear's employees, an election would never be awarded.

[2] Including the dismissal of the complaint as unfounded in respect of 10 discharges and layoffs.

determined as matter of law. As to some of the issues the record does not admit of any other findings than were made. As to others, the record wholly fails to support the findings. As to the claim that the entry of the order was at first, and its enforcement has since been, so long delayed that the order is now obsolete and would do violation to the real facts now existing, we think it is without point as to the discharges, and as to all the other orders, except those denying recognition to and requiring disestablishment of Etowah as representative. We think however that as to those portions of the findings and order, there should be re-reference to the Board for further and prompt hearings and findings and orders on them, bringing the proceeding to date.

■■ We turn then to a consideration on the merits, of the petition for enforcement of the other orders. Of these the discharges fall broadly into three groups, A, the eviction on June 8, 1936, of 12 United employees, and the failure to rehire them until 1937, B, the 1936 discharges of Morgan, Christopher and Taylor, C, the 1937 discharges. We think the findings are supported, and enforcement should be ordered as to Groups A and B, and unsupported and enforcement should be denied as to all except Parker in Group C. Our reasons for these conclusions may be briefly stated. First come the evictions. There is much contention as to whether respondent was responsible for the high state of feeling and the acts of violence in Gadsden in 1936 which followed the efforts of United to completely organize the Gadsden plant, and a great part of the evidence deals with these matters preceding and leading up to the eviction of the 12 employees. While we think the evidence supports the Board's finding that respondent in this proceeding cannot escape responsibility for a part in that state of feeling and those acts, we think all of this is beside the mark on the eviction charges here under review. For it is not denied by respondent, indeed it puts forward as a defense, that the 12 were evicted because of their membership in or sympathy with United, as a result of the demands of other employees that they be evicted. Difficult as an employer's position may be under such circumstances, its duty is plain. The statute prohibits discrimination against persons on account of their membership in or activities on behalf of unions. It specifically prohibits the discharge of employees for the purpose and with the effect of discouraging membership in a union. On the admitted facts respondent cannot escape responsibility for these evictions and discharges. The discharges in Group B of Morgan, Taylor and Christopher, while not under precisely the same circumstances, took place under circumstances sufficiently close to them to sustain, indeed to require the conclusion that these discharges were the result of the feeling against United then rampant in the plant and community, and, to say the least of it, yielded to by respondent. It was its duty to resist such violent domination of its right and power to employ whether manifested by or toward United. It cannot escape responsibility for the consequences of its failure to discharge that duty. The findings as to these discharges are well sustained.

■ As to the 1937 discharges, the matter stands differently. Here, unlike those in Groups A and B, the discharges were not a group result of group pressure by employees and therefore determinable as a group. As to them, each case must be examined and determined on its own individual facts, N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433. We have therefore carefully examined the record and canvassed the fact findings as to each of these discharges in the light of this examination. Accepting the preliminary fact findings of the Board as correctly found as to each, we think it clear that under the controlling principles of law its ultimate finding in each case, except that of Parker, is wholly without support in the evidence. Taking them individually and as a whole, the ultimate findings or inferences of the Board were based on nothing more than that the evidence showed antipathy to United, and the persons discharged in each case for an assigned cause, were members of or applicants for membership in United. This will not at all do. Nothing is better settled in the law than that while discharges may not be made because of and to discourage union membership or activity, membership in a union is not a guarantee against discharge, nor does the fact alone, that an employer dislikes a union or a union man, prevent his exercising his undoubted right to discharge. Findings of the Labor Board just as findings of a jury, must rest upon evidence, not surmise or suspicion, Magnolia Petroleum Company v. N. L. R. B., 5 Cir., 112 F.2d 545. It is only fair to say however that the confusion of law in the mind of the

Board, that antipathy toward a union once shown to exist, is all the evidence needed to convict of a discharge as an unfair practice, is a natural one. It arises from the fact of the Board's dual relation to the charge. Its right hand accusing, its left hand hearing as a judge, it is the most natural thing in the world for the Board to sometimes forget that as accuser it must make, as judge it must have, not surmise but proof, of the facts on which a finding of unfair practices is to be based. Quite natural too is it that occasionally the suspicion, surmise, feeling and conviction which give legitimate force and vigor to it as prosecutor, should, in its dual capacity, be allowed to suffice for proof. But this of course will not do. For the Board as accuser must furnish to itself as judge, proof in such amount and quality, that one having no interest whatever as accuser and interested only in a just result, could reasonably draw the inferences of guilt which as accuser, it belabors itself as judge to draw.

 We and other courts have in many cases set down the rule which must guide the Board in deciding matters of this kind. In N.L.R.B. v. Riverside Mfg. Company, 5 Cir., 119 F.2d 302, at page 307, we said of a discharge: "The only facts found which at all tend to support the Board's conclusion that he was discharged for union activity are that he was a member of the union, and the management did not like the union or his belonging to it, and had said so. If real grounds for discharging him had not been shown, or if he had been discharged for trivial or fanciful reasons, these facts would have supported an inference that he was discharged for union activity, but when the real facts of the discharge appear, these facts are stripped entirely of probative force. For it is settled by the decisions that membership in a union is not a guarantee against discharge, and that when real grounds for discharge exist, the management may not be prevented, because of union membership, from discharging for them."

In N. L. R. B. v. Tex-O-Kan Flour Mills Co., 5 Cir., 122 F.2d 433, 438, 439, we said: "In the matters now concerning us, the controlling and ultimate fact question is the true reason which governed the very person who discharged or refused to re-employ in each instance. There is no doubt that each employee here making complaint was discharged, or if laid off was not reemployed, and that he was at the time a member of the union. In each case such membership may have been the cause, for the union was not welcomed by the persons having authority to discharge and employ. If no other reason is apparent, union membership may logically be inferred. Even though the discharger disavows it under oath, if he can assign no other credible motive or cause, he need not be believed. But it remains true that the discharger knows the real cause of discharge, it is a fact to which he may swear. If he says it was not union membership or activity, but something else which in fact existed as a ground, his oath cannot be disregarded because of suspicion that he may be lying. There must be impeachment of him, or substantial contradiction, or if circumstances raise doubts, they must be inconsistent with the positive sworn evidence on the exact point. This was squarely ruled as to a jury in Pennsylvania R. R. Co. v. Chamberlain, 288 U.S. 333, 53 S.Ct. 391, 77 L.Ed. 819, and the ruling is applicable to the Board as fact-finder."

In N. L. R. B. v. Nevada Consol. Copper Corp., 62 S.Ct. 960, 961, 86 L.Ed. ——, the Supreme Court put it this way: "Examination of the record discloses that there was substantial evidence from which the Board could have concluded that respondent's refusal to employ the men was motivated by its belief that they had engaged or threatened to engage in destruction of respondent's property and had threatened to injure some of respondent's managerial employees and members of their families. There was also substantial evidence from which the Board could have concluded, as it did, that respondent's motive for refusing the employment was discouragement of membership in a labor union. The possibility of drawing either of two inconsistent inferences from the evidence did not prevent the Board from drawing one of them, as the court below seems to have thought."

 And in the most recent decision from this court, Stonewall Cotton Mills, Inc., v. N. L. R. B., 129 F.2d 629, we put it thus: "It is sufficient to say that our function here is to examine the record for ourselves and determine, as we do in a review of cases tried to a jury, where the claim is that the verdict is without support in the evidence not what findings we think the triers ought, upon the evidence, to have made, but whether the findings they did make are supported by substantial evidence, that is, whether reasonable and unbiased

minds could have reached the conclusions and made the findings that were made. If therefore, there is any substantial conflict in the evidence as to any of the facts found by the Board, its findings resolving that conflict are binding on us. Further though the evidence is without conflict, if more than one inference can reasonably be drawn from it, the Board's determination as to the inference to be drawn likewise binds us. Only where there is no substantial conflict in the evidence and only one permissible inference may be drawn from it, when, in short, what the evidence amounts to is a question of law rather than of fact, are we permitted to set aside findings of the Board as without support in the evidence."

Subjecting each of the ultimate findings of the Board as to each of the employees in question to this test, resolving all the conflicts in the evidence and all conflicting inferences in favor of the Board's findings, we think it may not be doubted that these findings are without support in the evidence. It will serve no useful purpose to analyze each case. The Board has done it. But, a brief analysis of the primary findings on which the ultimate findings are rested, may not be amiss. Six of those whose discharges were found by the Board to constitute unfair labor practices were tire builders. Of these there are approximately 215 in the plant, working in three shifts of 85 each. Each tire builder completes between 40 and 80 tires on his shift. The inspector does not attempt to check all the tires, but about 10% of the work of each tire builder on a shift. There was no evidence that they inspected one any differently from the others. In 1937, before these discharges occurred, respondent on instructions from the Ohio Corporation, tightened up on its inspection. It is a well established rule in respondent's plant that whenever a tire builder discovers that he has built a short ply in a tire, he must call the defect to the attention of his supervisor. If he has done so he is not penalized for having built the tire. It is found as to each of the men that he did do the thing for which he was discharged. Though there was no evidence that this was ever done, the Board suspected that because some of the inspectors, supervisors and officials in this division, had shown antipathy to United, they could have made a more closer inspection of the tires of United's tire builders than of the others. Though there was no evidence that

any non-union tire builder had been guilty of and excused from discharge for the faults for which the discharges were made, said the Board, "We think it *extremely suspicious* that only United members should have been discharged for this defect in accordance with the respondent's alleged rules, when it allegedly tightened up its inspection in 1937." (Italics supplied.) There is no evidence as to a single one of these persons, except Parker, that any ground for his discharge was given or suggested except the fault charged, but the Board, because and only because he was a union man and wore a United button, finds, against the undisputed testimony that it was not, and on suspicion that this defect was used in each case to conceal the fact that the discharges were really because of his United membership and activity. The only exception to this is in the case of Parker. In his case, which is a very strong one as to breaches of the rule, there is testimony that one of his supervisors had told him to be careful because "they are watching you like hell." Parker testified too, though this was denied; that when he went in to see Neiger, the superintendent, to get a new chance, "he asked me who fired me and I told him, Mr. Goodall. 'Well, if Mr. Goodall fired you I can't go against his desires.' At the end of his speech he said 'Parker, so far as I am concerned you have built your last tire. We don't need you any longer here. Let this be a lesson to you wherever you go. Get on the right side.'" "Did you understand what he meant by the right side?" "No, sir." "Did he explain it any further?" "No, sir." "Had he ever told you where the wrong side was or where the right side was?" "No, sir."

While in view of the repeated breaches of the rule in Parker's case it seems to us much more probable that the reason given him was the true reason for his discharge, we cannot say in view of the testimony above quoted, that a reasonable person having no interest in the matter could not have drawn in Parker's case, the deduction the Board did draw. Of the others found by the Board to have been laid off or discharged in 1937 in violation of the statute, two of them, Garren and Thompson, were laid off because of necessary reductions in the force, on the assigned ground that considering seniority, skill and number of dependents of each employee, they were the men to go. There is no evidence whatever that in so deciding the

foremen were not exercising their best judgment in accordance with the rules and practices of the plan. The only evidence on which the Board purports to base its finding of unlawful discharge is, that there was antipathy to United and these two wore their United buttons in the plant. As to the four others found to have been discriminated against, Ayres, discharged for improperly curing beads, Dick, discharged for leaving work early, admittedly a serious offence, Woodruff discharged for running an off-angle breaker, after, as he testified, he and other members of the crew had been warned on several occasions not to do so, and one Edgeworth, who, after being put in a position he didn't like, quit, the only evidence relied upon to overcome the force of the admitted facts, is general antipathy to United and that they wore United buttons.

When it is further considered that during the period in question, when these discharges occurred, from April 1, 1937 to August 21, 1937, 74 employees were discharged or laid off by respondent, of which only 24 were members of United, and that in each case of a discharge, the reason given for it really existed, it is clear that the finding of the Board that that reason will not be accepted as the real one but must be recognized as a pretext, is based entirely on suspicion and amounts in effect to the holding that when a United man commits a fault and is discharged, the fact of his Unionism raises a presumption that the ground assigned was a false one. Matters of this kind may not be decided on suspicion, surmise and feeling, rather than on evidence, and findings resting on these bases may not stand. As to Etowah, the evidence concluded in December, 1937, throws no light whatever on conditions existing at the plant since that time. It does not show whether the claimed company support, domination and interference found by the Board still exists, has been increased, or has been entirely removed. Nor do we know whether Etowah is now recognized in whole or in part by the company as a bargaining agent, nor what its membership or claimed membership is. Neither are we advised as to those facts with regard to United. We cannot tell from the record whether the matter was frozen by the refusal of respondent to recognize Etowah, the refusal or neglect of the Board to order an election, and the filing of the charges instead, and five years afterwards, still stands that way, or whether fundamental changes have occurred which would materially affect the enforcement of the order. In addition we take judicial knowledge of the fact that since this hearing was had, indeed since the order was entered, tremendous changes have occurred in connection with the respondent and other companies in the rubber industry and in the United States generally with respect to rubber.

Under the circumstances of this tremendous delay in settling a labor dispute, a delay for which, upon the record, the Board is primarily if not alone responsible, and under the circumstances in which the country now stands, it would be a useless, if not a foolish thing for this court to undertake now to determine whether the evidence offered in 1937 supports the order made in 1940 and should be enforced in 1942.[3] The proper course, as to whether Etowah does now, and its right as affected by company domination and support to, represent the employees, is, retaining jurisdiction of the case on that issue, to remit it to the Board for further hearing and findings. A decree may therefore be presented directing the enforcement of Paragraph C, D and E, of the cease and desist order, and of Paragraphs B, C, D, G, I, J, K, as written, and Paragraphs E and F as to Parker alone, of the order to take affirmative action. The petition as to Paragraphs A and B of the cease and desist order, and as to Paragraph A of the order to take affirmative action, is retained for further action by this court upon additional evidence, to be taken by and findings and order of the Board on the issues it involves. The order to take the affirmative action required by Paragraph H, as to Howard, Brown and Beauford, will not be enforced and is set aside. Completely inconsistent with the Board's direct and positive findings that the charges in the complaint as to discrimination in respect of these persons are not sustained, this order is without basis in the evidence and findings, and is therefore an abuse of the Board's discretion. The Board may not thus supervise and superintend the employing policies of a company with respect to persons in re-

---

3 "The court * * * shall have power * * * to make * * * a decree enforcing, modifying, and enforcing as so modified, or setting aside in whole or in part the order of the Board." 29 U.S.C. A. § 160.

gard to whom the Board's own findings are, that they were not discharged in violation of the law and that the complaint should be dismissed. The petition for enforcement is granted in part, denied in part and in part retained for action after further hearing and findings by the Board.