## NATIONAL LABOR RELATIONS BOARD v. WILLIAMSON–DICKIE MFG. CO.

### No. 10200.

Circuit Court of Appeals, Fifth Circuit.

July 23, 1942.

Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, and David Findling, Atty., National Labor Relations Board, all of Washington, D. C., for petitioner.

Sidney L. Samuels, of Fort Worth, Tex., for respondent.

Before HUTCHESON, HOLMES, and McCORD, Circuit Judges.

HUTCHESON, Circuit Judge.

Williamson-Dickie Manufacturing Company is a Texas corporation engaged in Fort Worth in the manufacture of men's and boys' work pants, shirts, coveralls, and overalls. Upon charges of the Amalgamated Clothing Workers of America, the National Labor Relations Board, on February 11, 1941, issued its complaint against the Company charging it with unfair labor practices in violation of the

National Labor Relations Act, 49 Stat. 449, 29 U.S.C.A. § 151 et seq. The complaint charged that respondent, had in violation of Section 8(1) [1] of the Act, interfered with, restrained, and coerced its employees in the exercise of the rights guaranteed to them by Section 7 of the Act, and had in violation of Section 8(3) [2] of the Act, discriminatorily discharged four employees, Donald Travis Dean, Joyel Esteene Foreman, Charles William Phillips, and Phillip Tony Meek.

The Company made specific denial of the material allegations of the complaint. On March 1, 1940, a hearing was held at Fort Worth before a Trial Examiner. At the conclusion of the hearing the Examiner made findings of fact and conclusions of law, and held that the Company was guilty of the unfair labor practices alleged, save and except as to the discharge of Charles William Phillips. The Board affirmed these findings and conclusions except as to Phillips. It found that all four employees named in the complaint had been discriminatorily discharged because of and to discourage membership in a labor organization, and that by such discrimination the respondent had discouraged membership in the union, and had been guilty of the unfair labor practice denounced in Section 8(3). It further found that by statements of certain supervisory employees, and by the granting of a well-timed wage increase on August 30, 1940, the Company had interfered with, restrained, and coerced its employees in violation of Section 8(1). The Board accordingly ordered the Company to cease and desist from its unfair labor practices, to offer reinstatement with back pay to the four discharged employees, and to post appropriate notices of compliance. This petition for enforcement of those orders, thus presents two aspects. One has to do with violation of Section 8(1) the subject of the cease and desist orders, the other, with violation of Section 8(3), the subject of

the orders to take affirmative action. As to the first, the evidence shows that the respondent issued strict orders against circulation of union literature on company time and on mill property, and required of all employees, supervisory as well as others, strict compliance with the rule against discussing the union while employees were at work in the plant. There is evidence too that it was itself endeavoring to comply, and to compel its employees[3] to comply with the provisions of the National Labor Relations Act, prohibiting it from encouraging or discouraging labor organizations or membership in them, and from interfering with the right of their employees to self-organization, from which the Board could have found that no case of interference, restraint, and coercion, in violation of Section 8(1) of the Act, was made out. The Board however found that by various anti-union statements of supervisory employees and by acts and attitudes, including the sudden granting of a wage increase, respondent interfered with, restrained and coerced its employees, in violation of Section 8(1) of the Act. Taking the evidence as a whole we cannot say that these findings are without support in the evidence. The Board's orders to cease and desist from such practices will therefore be enforced.

As to the second aspect of the petition, the enforcement of the affirmative orders requiring reinstatement of those discharged, we think it clear that the findings that the discharges were discriminatory within the meaning of Section 8(3), are without support in the evidence. Enforcement of these orders will therefore be denied.

Because of the highly explosive character of the controversies arising under the National Labor Relations Act and its enforcement, there has been much looseness and confusion of thought and language in its enforcement not only as to the meaning and effect of the section of the statute

---

1 "It shall be an unfair labor practice for an employer—(1) To interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7 of the Act [157 of this title]." § 158 (1), Title 29 U.S.C.A.

2 "It shall be an unfair labor practice for an employer * * * (3) By discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage

membership in any labor organization." § 158(3), Title 29 U.S.C.A.

3 "Excerpt W. D. Union News, 9/4/40. Floor ladies have stopped talking against the union. Remember we told you last week that we had written the management asking the floor ladies to stop talking against the union. Evidently the management talked to the floor ladies. At any rate the floor ladies haven't let out a peep since last Wednesday."

in question here, defining and prohibiting the unfair labor practice of discriminatorily discharging, to encourage or discourage union membership but also as to the function of the Board as champion not only against discriminatory discharges but against discharges for cause of any members of a union whose cause, as accuser, the Board has actively espoused.[4] The result has been an interpretation of the statute not only in union pronouncements[5] but by employees and agents of the Board and sometimes as here, an application of it by Examiner, and Board, as a barrier not against discriminatory discharges of union men but against any discharge for a cause not deemed sufficient by Examiner or Board. Because this is so, we think it well to here restate the principles controlling the decision of this case before making their application to its facts.

"* * * As between employer and employee the statute confers no right of action triable by a jury or otherwise. No provision in it authorizes an employee to make claim. The act does not purport to confer, it does not confer, private rights. * * * The procedure the statute outlines is not designed to award, the orders it authorizes do not award, damages as such. The proceeding is not, it cannot be made, a private one to enforce a private right. It is a public procedure, looking only to public ends. The statute has in mind the maintenance and furthering of industrial amity, and therefore peace, the prevention of industrial war. * * * The statute authorizes reparation orders not in the interest of the employee, but in the interest of the public. A cease and desist order operating retrospectively is not a private award * * *. It is a public reparation order, operating retrospectively by way of an order to cease and desist as to unfair practices, from their beginning; practices as to which, because forbidden in the interest of industrial amity, and therefore peace, Congress has the right to eradicate them as from the beginning." Agwilines, Inc., v. N.L.R.B., 5 Cir., 87 F.2d 146, at page 150, 151. "* * * Orders for reinstatement of employees with back pay are somewhat different. They may impoverish or break an employer, and while they are not in law penal orders, they are in the nature of penalties for the infraction of law. The evidence to justify them ought therefore to be substantial, and *surmise or suspicion, even though reasonable, is not enough.* * * * So far as the National Labor Relations Act, 29 U.S.C.A. § 151 et seq., goes, the employer may discharge, or refuse to reemploy for any reason, just or unjust, *except discrimination* because of union activities and relationships." N. L. R. B. v. Tex-O-Kan Mills, 5 Cir., 122 F.2d 433, at page 438. (Italics supplied.)

In N. L. R. B. v. Riverside Mfg. Company, 5 Cir., 119 F.2d 302, at page 307, we said of a discharge: "The only facts found which at all tend to support the Board's conclusion that he was discharged for union activity are that he was a member of the union, and the management did not like the union or his belonging to it, and had said so. If real grounds for discharging

---

[4] Cf. Magnolia Petroleum Company v. N. L. R. B., 5 Cir., 112 F.2d 545; Humble Oil & Refining Company v. N. L. R. B., 5 Cir., 113 F.2d 85; N. L. R. B. v. Ford Motor Co., 5 Cir., 119 F.2d 327; N. L. R. B. v. Riverside Mfg. Co., 119 F. 2d 302; N. L. R. B. v. Goodyear Tire & Rubber Company, 5 Cir., 129 F.2d 661.

[5] Respondent's Exhibit No. 5.
(Tr. 387—Rejected)
"W. D. Union News.
"Ft. Worth, Texas.    October 11, 1940.
Company Fires Non-Union Employees.
"During the past two weeks the W. D. Company has fired several people. None of them were Union members. We don't know what reason the Company gave for firing these people, but we do know that in several cases it looks very much like the Company was just tired of having them around. We'd like to point out that when Travis Dean and 'Peewee' Foreman, both Union members, were fired

without a good reason they took their cases to the Labor Board and have a very good chance of getting their jobs back with back pay. But the folks who were fired since then, who weren't Union members, have no comeback. They are just out of jobs and that is all.

"It seems to us that more of the folks in the factory could look at this and see what has happened, and then realize that they should come in with us where they have some protection.

"W. D. Union News, 9/4/40—Notes Around the Factory.

"We also understand that Mr. Sloan feels that if he had two friends one union and one non-union, and even though he liked the non-union men better, he would treat the union men better these days. Could this be why everyone is so good to the union folks in the factory these days?"

him had not been shown, or if he had been discharged for trivial or fanciful reasons, these facts would have supported an inference that he was discharged for union activity, but when the real facts of the discharge appear, these facts are stripped entirely of probative force. For it is settled by the decisions that membership in a union is not a guarantee against discharge, and that when real grounds for discharge exist, the management may not be prevented, because of union membership, from discharging for them."

In respect of the unfair practices in question the controlling fact question is whether the evidence supports the ultimate findings that the employees in question were discriminated against, that is, were treated differently from employees similarly situated, in order to discourage membership in a labor organization. The Examiner has found that three of the employees were, that one was not, the Board that all four were discriminatorily discharged. The respondent insists that there is no evidence whatever that there were any employees situated as these were, except as to membership in the union, who, notwithstanding the similar circumstances, were retained in respondent's employ, and therefore none that the employees in question were discriminatorily discharged. We agree with respondent.

The record will be searched in vain to find any resemblance between the cases of the four employees who were discharged and the cases of any of those not discharged upon which an inference that the discharges were discriminatory could be based. It will be searched in vain too for any evidence either that no non-union members, or more union than non-union members were discharged within the same period. Quite to the contrary it shows that great numbers of non-union employees were discharged during the same period, whether for cause or, as the union bulletin quoted in the preceding note says, without cause, the record does not show. But it does show that a great many more non-union than union employees were discharged in this period. It shows too, as the findings do, positively and without dispute, the circumstances under which the four were discharged, and it does not show that any non-union employees were, under the same circumstances, given different and therefore preferential or discriminatory treatment. In addition, the record shows that

in each case there were good and sufficient reasons for discharge, and it fails to show that non-union employees who, in the opinion of respondent, had acted in the same way, had been excused from discharge by respondent. It therefore completely fails to furnish the basis for an inference that the discharges though ostensibly for good cause were in fact discriminatory.

In Humble Oil & Refining Company v. N. L. R. B., 5 Cir., 113 F.2d 85, 88, and other cases, we have pointed out; that the statute does not make the Board either "guardian or ruler" over employees of employer; it does not authorize it to substitute its judgment for that of the employer as to what is sufficient cause for discharge. It empowers it only to deliver the employees from acts and restraints forbidden by the statute, and to reinstate them when they have been discriminatorily discharged. The primary fact findings of the Trial Examiner which were adopted by the Board substantially as he wrote them, correctly set out the circumstances surrounding the four discharges, and the error of Examiner and Board is not in the fact findings but in the conclusions drawn from them. It will not therefore, be necessary to set out the facts in any detail here. It will be sufficient to summarize them as to each case pointing, in the cases of Dean, Meek and Foreman, to some of the undisputed facts set out in the findings, which make particularly egregious the assumption of authority by Examiner and Board to supervise, and interfere in the interest of members of the union with, the exercise by respondent of its undoubted rights. These rights are to set standards and rules for conduct, to maintain and preserve order and discipline, in the plant, and to discharge for breaches of these standards and rules, that order and discipline.

As to Phillips, the record shows that he was laid off, not for misconduct but for illness, for which he was given careful and curative treatment, and that he was not taken back later solely because the employee who had taken his place had proven to be more competent. It shows that no non-union employee similarly situated with him was given a different treatment, indeed, so clear is it that there was no basis in the findings for the conclusion of discrimination that even the Examiner could not sustain the complaint.

The record as to Foreman shows that he was discharged because, after a thor-

ough investigation,[6] he was found by the respondent, on evidence amply supporting the findings, to have been guilty of pinning on the back of one of the female employees, during work hours, a sticker or sign too lewd and lascivious in its suggestion to be set out here, and so obscene that if sent through the mails, it would have constituted a federal offense. It also shows that Frances Love, a woman inspector, an active member of the union organizing committee, who admitted having earlier placed the sign on her own back, though not quite so suggestively, was not discharged. The Board, substituting its own judgment for that of the management as to the lasciviousness of the conduct on respondent's premises, and its being sufficient grounds for discharge, a matter not remitted to the Board but left by law to management, casually brushed the whole disturbance of order, discipline and good morals aside, with a quip more consonant with its role as an accuser than its role as judge, "the respondent's alleged moral indignation was far stronger than that of the victim who was willing to forget about it and have Foreman reinstated. We are convinced, as is the Examiner, that the moral aspects of this incident were aggravated by the respondent in an attempt to aggravate its seriousness." With equal casualness it dismissed the argument that failure to discharge the inspector, who had admitted having earlier put the sign on her own back, though she was a member of the union organizing committee and Foreman was not, showed that Foreman's discharge was not discriminatory under the Act, with the remark: "We do not believe that the respondent's failure to discharge Love is any indication either that it did or did not have an anti-union motive in discharging Foreman." Broadminded sophistication undoubtedly has its proper place, and sometimes a not unenviable one, but it is, we think, wholly out of place here. Here what was in question was not only essentially indecent in the prevailing if provincial climate of opinion of the state of its occurrence, but the doing of such things was prohibited by a Texas statute. In view of the Texas statute,[7] the clearly obscene character of the sticker or poster, and the particularly lascivious suggestion carried by its placing on the back of one of the women employees, conduct interdicted both by statute in Texas and the simple decent standard prevailing there, we think it quite clear that the Board's conclusion as to Foreman's discharge, was not only without support in, but was completely contrary to, the evidence, and its order may not stand. Cf. N. L. R. B. v. Dixie Motor Coach Corp., 5 Cir., 128 F.2d 201.

As to Dean, the findings show that for some time before any union activity had begun in the plant, and culminating about the middle of July, Dean, a cocky youngster 24 years of age, with a little smattering of information, practical and theoretical, and an overweening sense of his own importance, had been conducting a one man campaign to impress the management with a sense of its deficiencies and his own importance. Incensed because Snyder, the new superintendent, had demanded an increase of output, and would not do what Dean thought he ought to about pressing the pants and other matters, Dean had talked bitterly to and about Snyder. The manager had called him in for a conference on July 19th, nearly a month before any union activity had commenced in the plant, and at the end of it, had made this note. "This employee in his present action is undesirable. We will endeavor to improve his cooperation and efficiency and if not successful, will be forced to discharge him." Whether, as seems likely, for he met his discharge with the defiant statement that he knew it was for union activity and the threat that he was going to file charges with the Board forthwith, it was his joining the union and his feeling that with the union and the Board back of him, he could not be discharged, and he was trying as Stoddard did, to make a test case,

---

[6] In the course of the investigation Foreman denied that he had put the sticker on and after his discharge accused another employee of it, but he did admit that he had tried to get one of the women employees to pin the sticker on the back of the girl it was pinned on and the conclusion that he either pinned it or was the instigating cause of its pinning was fully supported.

[7] "It shall be unlawful for the owner, manager, superintendent or other person in control or management of any factory, mill, workshop, mercantile establishment, laundry or other establishment where five or more persons are employed, all or part of whom are females, to permit in such place of employment any influence, practices or conditions calculated to injuriously affect the morals of such female employees." Art. 5178.

N. L. R. B. v. Times-Picayune Publishing Co., 5 Cir., 130 F.2d 257, or whether it was just the full flowering of his own self-importance which brought the matter to a head, the Board does not find and we cannot say. The fact is however that after he had become a member of the union organizing committee, he did, on premises of the company and in the presence of several of its employees, boastfully and defiantly say, among other things: "I have told Snyder ten times I don't like him. I am going to put him out. I will fight to the last ditch to get him. I will put this fellow Snyder out if I have to throw him out. I am going to fight him as long as he is in the plant."[8]

As a result of the report of this occurrence to Williamson, the manager, Dean was called in for an interview,[9] in the course of which Dean did not deny that he had made the statements attributed to

[8] This, as the Board's findings set it out, is the way the matter occurred. "A group of employees, including Nichols and Foreman, were gathered on the third floor during lunch hour and, as Dean approached they appeared to be talking about him. Dean joined the group, and Nichols stated she had been absent for two days and 'this is what she found' on her return. She asked if the employees were all 'mad' at her and when Dean replied in the negative, she asked, 'Well, what is all this trouble?' Dean replied that there was no trouble and said, 'If you are talking about us joining the Union, we have a perfect right to.' Nichols agreed and asked, 'But what is your object, what is the trouble all about?' Dean then talked of the excessive heat in the department and of Snyder's policy of employing girls on the toppers, reducing the men's earning and increasing the production quota. Dean also stated as testified by Nichols and others: 'I have told Snyder ten times I didn't like him * * * I am going to fight him as long as he is in the plant,' and said that he was going to have the girls taken off the toppers. Foreman stated, 'We may go down fighting, but if we do we will come up and fight for our rights again.' Nichols told them, 'Well, you do anything you are men enough to do, it is okeh with me. * * * Nichols then went to see Snyder and asked if he knew the reason for Dean's outburst. Snyder replied that he had had no trouble with Dean and did not know the reason. Nichols then reported the incident to Williamson and asked him to talk to Dean and 'see if he could make him feel better.' "

[9] "A few hours later Williamson sent for Dean, who was accompanied by Walter Nichol, an employee. The testimony of Dean and Williamson concerning the conversation that ensued presents no material inconsistencies. However, Dean testified to some matters which were not mentioned by Williamson, and which the latter did not deny. We find, as did the Trial Examiner, that the following occurred: 'Williamson stated, in opening the conversation, that Dean had declared that he could not accept Snyder as his boss, and asked what was wrong, Dean replied that it was a matter of Snyder's tactics and policy, and pointed out that they had discussed the same problem a month earlier and that he thought Williamson had then agreed that Snyder had been wrong. Williamson replied that Dean's attitude was surprising to him and that he had been under the impression that the matter had been settled and that Dean was going to accept Snyder and cooperate with him, but that it now appeared that Dean was opposing the respondent's policy. Dean then stated, and this is undenied, 'Mr. Williamson, do you mean to sit there and tell me that American people don't have the right to organize into unions?' When Williamson replied, 'Well, we can't go into that end of it just now', Dean continued, 'Do you mean to sit there and tell me that we couldn't (sic) have gotten over 100 members signed into our union if that work up there wasn't absolutely drudgery.' Williamson replied that it was within the province of the management to select its supervisory officials and that, in opposing Snyder, Dean was opposing the policies of the respondent. He then asked, 'Then I can't reconcile you to accepting Snyder as your boss?', to which Dean replied, turning to Walter Nichol, 'No, we have tried, isn't that so Walter?' Nichol answered, 'He kept cutting my salary and wouldn't listen.' Williamson then stated that Dean was insubordinate and that he was being discharged for that reason. Williamson forbade Dean to return to the plant for his personal belongings, saying that they would be brought to him and that he did not want Dean on the premises. Dean stated, and this is also undenied, 'Mr. Williamson, in the first place I don't think you are firing me for insubordination. You are firing the ringleader of this thing in order to stop it.' A few minutes after he had been discharged, Dean informed Williamson that he was going to file charges with the Board forthwith."

him but re-affirmed them and his opposition and purpose to get rid of Snyder and Mr. Williamson said, "It has always been in the province of this company to select its own officers." At the end of the interview and in the presence of another employee, whom Dean had brought along as a witness, Dean was, as had to be if discipline was to be maintained in the plant, discharged for insubordination. Whereupon, further illustrating the contentious and defiant character and temper of Dean, the following appears in Dean's testimony: "'I don't understand what you mean by insubordination. I have spent four hard years of service in this company', and I went into explaining the difficulties I had been through, the working conditions, etc., and I said, 'If you are firing me for insubordination I don't think you have the least feeling for humanity. Furthermore I think you are the poorest excuse for a human being I have ever had the opportunity to meet up with." I said, "Walter go, I don't want you to be in the building at all."

On these facts, the Board, again as judge, making membership in the union, whose cause it had espoused as accuser, a guarantee against discharge and again substituting its own ideas of plant discipline and subordination for those of the management, and upon no evidence whatever supporting it, found Dean's discharge discriminatory in this language. "His statements to Williamson later that day immediately prior to his discharge were only a detailed reiteration of what he had said to Nichols. Thus viewed, Dean's opposition to Snyder was an expression of the kind of concerted activity in which under the Act employees have a right to engage in without interference from their employer. No substantial showing has in our opinion been made that Dean's conduct in exercising this freedom of action, was such as to warrant his discharge."

In view of the very large powers and wide discretion granted by the Act to the Board and the grave consequences of an abuse of these powers and this discretion by the Board, we cannot, in the exercise of our function in enforcing the Board's lawful orders and in refusing to enforce those which are not, too often repeat, that it has not been given to the Board to substitute its own ideas of discipline and management for those of the employer. It has not been given to it to supervise and control, except as precisely set out in the Act, or set standards for, the supervision and control of employee and employer relations. Cf. N. L. R. B. v. Goodyear Tire & Rubber Company, 5 Cir., 129 F.2d 661. Particularly it has not been given to the Board to find a discriminatory discharge, under circumstances like these, where the evidence not only fails to show that any other employee who had acted like Dean did, was excused from discharge, but the facts are such that the maintenance of discipline required Dean's discharge. The situation is the same here as in the Times-Picayune case where the employee panoplied in his union membership was deliberately insubordinate to make a test case out of it. There, as here, the Board condoned his conduct and espoused his cause. There, as here, we denied enforcement of the order, holding that insubordination was no less insubordination because with union and Board backing.

As to Meek, the evidence shows that though known to be an organizer of the union, no effort was made to discharge or otherwise discipline him, until on December 10th, when he was discharged "for having circulated a petition on respondent's premises in violation of an existing rule prohibiting such activity without permission and for having refused to desist from circulating the petition when requested to do so. The Board finds[10] that the rule existed; that a leaflet containing it had been distributed to the employees; that it was the practice of employees to obtain permission for circulating petitions; that

---

10 As the Board finds the facts, "There is no dispute that on December 10, Meek circulated a petition among the employees of the respondent without having obtained permission to do so, during the noon hour and on the plant premises. The petition was being circulated pursuant to action taken by the Union. It read as follows: 'We, the undersigned employees of Williamson-Dickie Mfg. Company, Fort Worth, Texas, hereby authorize attorney Joe Spurlock to represent us in an employees' suit under the Fair Labor Standards Act [29 U.S.C.A. § 201 et seq.] to recover pay for waiting time and/or overtime owed us by the Williamson-Dickie Mfg. Company." Meek's activities were reported to Williamson, who called Meek to his office. Williamson asked Meek what sort of a petition he was circulating, and Meek replied that he could not reveal the na-

Meek had violated the rule; and that on a request of Williamson, the manager, he refused to promise not to further violate it. Notwithstanding its findings that Meek had not only violated the rule but had flatly refused to promise not to violate it further, the Board nevertheless concluded without a shred of evidence to support it, that the discharge of Meek for this conduct, conduct of a kind in which no other employee had ever indulged, was discriminatory. This finding, of a piece with that excusing Dean's insubordination, in effect that because Meek was circulating the petition at the request of the union, respondent was prevented by the Act from asking him not to violate the rule, and also prevented by it from discharging him when he refused compliance, is not only without support in the evidence, but completely beyond the power of the Board. The Supreme Court in Southern Steamship Co. v. N. L. R. B., 62 S.Ct. 886, 86 L.Ed. ——, has made the Board's duty in cases of this kind, crystal clear. We cannot do better than paraphrasing a little to adapt it, to quote the language. "It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so singlemindedly that it may wholly ignore other and equally important objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate

task. This was the kind of consideration for which the present case called."

Enforcement of the cease and desist orders will be granted. Enforcement of the affirmative orders reinstating, with back pay, the four employees discharged, will be denied and the orders will be set aside.

ture of the document because it was 'Official business.' * * * Williamson then called Meek's attention to one of the rules of the company, printed in a pamphlet which had been distributed to the employees, which read, in part, as follows: '10. We do not take up collections, distribute cards, handbills, petitions, or circulars of any kind—except with the permission of Mr. Barnes, for the plant, or Mr. Burns, for the office.'

"Mr. Meek replied that he did not believe he had ever seen this rule but Nichols, who was then present, stated, and she also testified, that the leaflet containing the rule had been distributed to the employees. We find that such was the case. Williamson then asked Meek if he would agree not to circulate the petition without permission. There is some controversy as to Meek's reply to this question. Meek testified that he replied that he would like to have an opportunity to discuss the

matter with someone before making a promise. Nichols testified that something like that was said by Meek. Although Williamson denied that Meek made this statement, we find, as did the Trial Examiner, that Meek's testimony, as substantiated by Nichols, is correct. At any rate, Williamson pressed Meek for a promise that he would stop circulating the petition, and Meek replied that he would not give such a blanket promise. Thereupon Williamson discharged Meek, allegedly for refusing to obey a company rule after his attention had been called to it. Meek then accused Williamson of discharging him for union activities, stating 'I have never had any trouble as long as I have been working here until I started organizing, and since we started organizing I have been in nothing but hot water, and I believe you are firing me for union activity."