## NATIONAL LABOR RELATIONS BOARD v. RIVERSIDE MFG. CO.

·No. 9643.

Circuit Court of Appeals, Fifth Circuit.

April 23, 1941.

Rehearing Denied May 31, 1941.

Robert B. Watts, Gen. Counsel, and Laurence A. Knapp, Associate Gen. Coun-

sel, both of Washington, D. C., and Warren Woods, Regional Atty., of New Orleans, La., for National Labor Relations Board.

Waldo DeLoache, of Moultrie, Ga., W. Gordon McKelvey, of Nashville, Tenn., and J. O. Gibson, of Moultrie, Ga., for respondent.

Before FOSTER, HUTCHESON, and HOLMES, Circuit Judges.

## HUTCHESON, Circuit Judge.

The Board proceeding, out of which this petition comes, involves a small cotton mill located in Moultrie, Georgia, employing approximately 112 people, mostly women. It grew out of the efforts of the Amalgamated Clothing Workers of America, affiliated with the Textile Workers Organizing Committee, and the Committee for Industrial Organization (referred to throughout the proceedings, as the union or the T. W. O. C.), to organize the plant, represent- the workers therein as exclusive bargaining agent, and obtain a closed shop agreement. It began with a charge filed September 2, 1937, that Riverside Manufacturing Company, through Hutchins, its plant superintendent, was using coercive methods to prevent organization of the plant. By amendments, filed respectively October 13, 1937, March 24th, April 28th, and June 29th, 1938, additional acts of Hutchins, hostile to the union, the discriminatory transfer or discharge of, first, Mrs. Page, and Miss Tuttle, second C. B. Bradley and Frank Mercer, and later Lois and Mary Renfrow and Winona Hooks, and that the union had obtained a majority of the employees, and the company had refused to bargain, were added to the charge.

These charges along with a petition for investigation and certification of representatives were by order of June 29, 1938, consolidated for hearing, upon a complaint elaborating the charges, except that as to the discharge of the Renfrows, which was dropped.

The examiner's intermediate report filed October 19, 1938, sustained the complaint in full, except as to the Page and Tuttle discharges. On December 16, 1938, the union filed a fifth amended charge, carrying forward all of the old charges, and adding to it the charge that the company on or about October 26th, had permitted a group of its employees to stop the operations of its plant, and physically drive from it, nine employees, all or practically all of the remaining members of the union, and did on that day discharge or otherwise discriminate against them. Thereupon the proceeding was reopened and remanded, the complaint was amended to embody and elaborate upon this additional charge that the nine employees named had been ejected from the plant by the respondent and had been discharged and reinstatement refused by it for the purpose of discriminating against them, by reason of their membership in the union. The welter of charges and complaints having come to an end, and the respondent having joined issue; there was a hearing, an intermediate report sustaining the additional charge; and findings of the Board sustaining the complaint as to the unfair labor practices, the discharges of Bradley and Mercer, and the eviction of the other nine named employees, but not as to the discharges of Page, Tuttle and Hooks, and an order,[1] to cease and desist, and to take affirmative action.

[1] Order of Board.

Upon the basis of the findings of fact and conclusions of law, and pursuant to Section 10(c) of the National Labor Relations Act [29 U.S.C.A. § 160(c)], the National Labor Relations Board hereby orders that the respondent, Riverside Manufacturing Company, and its officers, agents, successors, and assigns shall:

1. Cease and desist from:

(a) Refusing to bargain collectively with Amalgamated Clothing Workers of America as the exclusive representative of all its production and maintenance employees, exclusive of supervisory and clerical employees;

(b) Discouraging membership in Amalgamated Clothing Workers of America, or any other labor organization of its employees, by discharging or refusing to reemploy any of its employees, or denying them protection at their work or in any other manner discriminating in regard to their hire or tenure of employment, or any term or condition of their employment;

(c) Discriminating against any of its employees for giving testimony under the National Labor Relations Act [29 U.S.C.A. § 151 et seq.];

(d) Permitting threats of physical violence to employees in its plant for the purpose of discouraging membership in or activities on behalf of the Amalgamated Clothing Workers of America;

(e) In any other manner interfering with, restraining, or coercing its employees in the exercise of the right to self-organization, to form, join, or assist labor organizations, to bargain col-

**304**

Petitioner insisting that its findings are supported by substantial evidence, and that its order is within the scope of its findings, and appropriate, sues for its enforcement. Respondent as vigorously insisting, that the findings are without support; and that the order is not responsive to or appropriate under the findings, resists enforcement and prays that the order be vacated and the proceeding dismissed. Particularly it insists that the case is one in which the Board in its administrative capacity, in collaboration with a nationally affiliated union, is endeavoring to seat the union, as representative of the employees, against their will and wish to have it represent them, and that the findings and order are responsive to and colored by this endeavor.

It insists therefore that the whole order is invalid and must fall, and if not, that at least that part of it requiring affirmative action must.

■ We have had recent occasion to point to the unfortunate plight of the ordinary unorganized employee, the forgotten man, in these controversies between nationally affiliated unions and employers. Caught between the upper and the nether millstone of the efforts of the national union, assisted by the Board in its administrative capacity, to organize and represent him willynilly, and that of his employer to prevent its doing so, the state of the ordinary employee is indeed a parlous one. We have carefully pointed out, as other

---

lectively through representatives of their own choosing, and to engage in concerted activities for the purpose of collective bargaining, or other mutual aid and protection, as guaranteed in Section 7 of the National Labor Relations Act [29 U.S. C.A. § 157].

2. Take the following affirmative action which the Board finds will effectuate the policies of the Act:

(a) Upon request, bargain collectively with Amalgamated Clothing Workers of America as the exclusive representative of its production and maintenance employees, exclusive of supervisory and clerical employees;

(b) Offer to C. J. Bradley, Frank Mercer, Thelma Hancock, Cora McMullin, Lela Hodges, Eunice Ellis, Maggie Price, Mae Rentz, Irene Richards, Flora Wilson and Mecie Childs immediate and full reinstatement to the positions formerly held by them or positions substantially equivalent thereto, without prejudice to their seniority or other rights and privileges and insure them full and adequate protection while they are in the employ of the respondent;

(c) Make whole C. M. Bradley, Frank Mercer, Thelma Hancock, Cora McMullin, Lela Hodges, Eunice Ellis, Maggie Price, Mae Rentz, Irene Richards, Flora Wilson, and Mecie Childs for any loss of pay they may have suffered by reason of the respondent's acts by payment to each of them of a sum of money equal to that which each would normally have earned as wages during the period from the date of the termination of employment of each to the date of the respondent's offer to reinstate, less the net earnings of each during that period; deducting, however, from the amount otherwise due to each of the said employees monies received by said employee during said period for work performed upon

Federal, State, county, municipal, or other work-relief projects, and pay over the amount so deducted to the appropriate fiscal agency of the Federal, State, county, municipal, or other government or governments which supplied the funds for said work relief projects;

(d) Afford all its employees reasonable protection in the plant at all times from physical assaults or threats of physical violence directed at discouraging membership in, or activities on behalf of, Amalgamated Clothing Workers of America, or any other labor organization;

(e) Instruct all its employees that physical assaults or threats of physical violence directed at discouraging membership in, or activities on behalf of, Amalgamated Clothing Workers of America, or any other labor organization, will not be permitted in the plant at any time, and take effective action to enforce this rule;

(f) Immediately post notices to all its employes in conspicuous places in and about its plant and maintain said notices for a period of at least sixty (60) consecutive days, stating (1) that the respondent will cease and desist in the manner set forth in paragraph 1(a), (b), (c), (d), and (e) of this Order; (2) that the respondent will take the affirmative action required in paragraph 2(a), (b), (c), (d), and (e) of this Order; and (3) that the respondent's employees are free to become or remain members of the Amalgamated Clothing Workers of America, and that the respondent will not discriminate against any employee because of membership or activity in that organization;

(g) Notify the Regional Director for the Tenth Region in writing within ten (10) days from the date of this Order what steps the respondent has taken to comply herewith.

courts have, that the act does not provide that employees must affiliate themselves with national unions, N. L. R. B. v. Brown Paper Mill Co., 5 Cir., 108 F.2d 867, that on the contrary, the act was designed to and does protect "the exercise by workers of full freedom of association, self-organization, and designation of representatives of their own *choosing*". Sec. 151, Title 29 U.S.C.A. We have also taken pains to point out that, in this situation, with the employer forbidden to aid him in any way, with the Board, as administrator and litigant against the employer, sponsoring the efforts of the national union to organize and represent him, and as trier, determining the truth of its own charges, the only protection afforded the unorganized employee, without resources or leadership to resist, is in the courts.[2] They alone, under the act, have the power to make coercively effective, the orders of the Board entered in these bitterly partisan contests, to which, under the decisions as they now stand, the unorganized employee, though he may be bitterly opposed to the union, is not, and cannot demand to be made, a party.

This case, from the standpoint of the unorganized and unwilling employees, is a peculiarly oppressive one. For the record, while leaving no doubt that the great majority, indeed nearly all of the employees of the mill, do not now wish to be represented by the union, and are personally bitterly hostile to it, shows also that the employer is hostile to the union, has by words and conduct coming within the pro-

[2] "The statute in conferring upon the Board jurisdiction both to accuse and to try, to prosecute and to decide, charges of unfair labor practices, confers these mutually antagonistic powers with full recognition of and in full subordination to, the principles, at once of natural right and of constitutional law, that no man may be a judge in his own cause and that accusation is neither proof nor evidence of guilt. To preserve these principles from corruption, the Statute, while giving wide and flexible powers of inquiry and hearing to the Board, yet insures, to every person affected by its orders, that his cause will be fairly adjudged, by providing, as an essential to enforcement of an order, that there be a judicial review upon the question whether, and a determination that, the order is supported by evidence. * * *

"The enforcing section of the act particularly shows that the Congress was primarily concerned to insure that the Board as accuser, must, in order to obtain enforcement of its order, secure judicial approval of its findings as trier, as supported by evidence, and thus afford the accused the due process of having the verdict of the Labor Board as trier, judicially reviewed and decided by the Circuit Courts of Appeals by the rules and standards applied to review of jury verdicts. * * *

"In its capacity as accuser, the Board, under the genius of our institutions, is held to the same burdens and obligations of proof as any other litigant who takes the affirmative. It may not by accusing put the accused upon proof. As accuser it must prove its charge.

"In its capacity as a trier of facts, the Board stands on the footing of a jury. Like a jury it must be impartial. Like a jury, it may not make findings without evidence to support them and as in the case of a jury, it is for the courts to say whether there is or is not evidence in support. * * *

"This must be so for if it were not, if the Board in the determination of these sometimes bitter and always partisan contests between nationally affiliated locals and those unaffiliated, were given the right at once, to sponsor as accuser the side of the national organization, and to determine conclusively, for itself, unchecked by judicial review, not only the effect of conflicting evidence but whether in law, there is any substantial evidence to sustain its accusation, it would be nothing short of a miracle if these proceedings either in their course or in their result should be found to afford due process. The American people from their beginnings have been skeptical of the occurrence of such miracles, and they have not been willing to leave the vital matter of a fair and just trial to the hazard of miraculous intervention. It is plain from the careful provisions the Congress has made in the act against the exercise of this unbridled power that it is equally skeptical of such miracles, and that it is equally unwilling to leave to such hazards the rights of self-organization which the statute guarantees to workers, free from compulsion from any source. *For, while a proceeding of this kind takes the form of a charge against the employer, the real substance and design of it is, to seat one labor organization over another, with the greatly unjust result, if the decision of the labor board is wrong, of depriving employees of the very rights the act guarantees them.*" * * * Magnolia Petroleum Co. v. N. L. R. B., 5 Cir., 112 F.2d 545, 547. (Italics supplied.)

306

hibitions of the act, evidenced its hostility thereto, and must be not only restrained from continuing that hostility, but also compelled to undo the harm its actions have caused the employees who desired representation by the union.

In this situation, though nothing in the act forbids anything that they have done or is directed at all against them, the other employees, without being afforded a hearing, and unrepresented and undefended, find themselves in the position of having their rights to refuse to be represented by the union greatly jeopardized, if not completely taken from them, by an order of the Board, entered against their employer, because of acts of the employer in violation of a statute, drawn and worded to protect them from the consequences of such acts. For, if anything stands out in the record so clearly that no reasonable mind could reach any different conclusion about it, it is that the union and its members are now "personae non gratae" with the great majority of the employees, and that moved by their own feelings of opposition and resentment, and not by any threat or promise from the management, these employees took the action they did because they felt that the union with the assistance of the Board was trying to force upon them the representation they did not want.

██ While, therefore, it is the duty of this court to enforce the orders of the Board against the employer, if supported by evidence, and appropriate, it is also the duty of this court to countenance and make no order which will, under the guise of disciplining the employer under the act, charge him with responsibility for independent acts of the employees, or unjustly take away from the employees, rights accorded to them under the act. Examining the order of the Board in the light of its findings, and the findings in the light of the record, we think it plain that, as to the employer's refusal to bargain with the union and its acts of hostility to it, the order and the findings are sustained, and must be enforced. Because, however, of

the peculiar situation shown by the record; that many of the employees complain that they were originally induced to enter the union by threats on its part that it had a majority and unless they joined immediately they would be forced out of employment or they would have their dues and initiation fees raised; that most of those who joined, formally, withdrew from membership; that none of the employees are now members; and that most of them are personally hostile to the union; this court should, as was done in the Clerk's case, in order that the purpose of the statute be not defeated, make sure by its order that the union is the representative of the employees by the free will and choice of the majority. The order will therefore be amended by adding to Clause (a) in Section (1) and to Clause (a) in Section 2 of the order, a clause in the nature of that in that decree.[3]

██ We think it equally clear that the facts found by the Board as well as those shown by the record not only do not support but are wholly inconsistent with the conclusions the Board drew; that the acts of the employees in ridicule of and enmity against members of the union culminating in their eviction from the plant were inspired by coercion or favors from the management; that the respondent discharged or refused to re-employ any of its employees; denied them protection; discriminated against them for giving testimony under the National Labor Relations Act; and permitted threats of physical violence to employees, or in any other manner discriminated against them on account of, or for the purpose of discouraging, membership in the union.

██ The charge as to Bradley as first filed, was that on January 12, 1938, he was discharged as a result of untruthful statements made about him by anti-union employees. Though this charge was never changed in any of the amendments to it, the complaint states and the Board in support of the complaint found, that Bradley was discharged because he joined a labor

---

[3] "Reinstating and re-establishing the said brotherhood as the representative of the clerical employees in all matters relating to their employment by the said railroad company, disputes as to pay, working conditions, etc., substantially as said status was on June 1, 1927, until such time as said clerical employees by a secret ballot taken in accordance with the further directions of this court, or

by any other means of selection which the employees themselves may decide upon and adopt, and without the dictation or interference of the said Texas & New Orleans Railroad Company, H. M. Lull, G. S. Waid, or J. C. Torian, shall choose another representative or representatives." Brotherhood of Railway and Steamship Clerks v. Texas & N. O. R. Co. et al., D.C., 25 F.2d 876, 878.

organization. The facts are that though Bradley joined in August, and though by October 1, 1937, he and Mercer were the only male members left in the union, no action of any kind was taken against him by the company until in January when a committee of the employees made the serious charge against him that he was suffering from a venereal disease. As a result of this charge and of Bradley's attitude and actions regarding it, and of other charges against him of misconduct and insubordination, Bradley, for causes justifying the, discharge, was discharged. The only facts found which at all tend to support the Board's conclusion that he was discharged for union activity are that he was a member of the union, and the management did not like the union or his belonging to it, and had said so. If real grounds for discharging him had not been shown, or if he had been discharged for trivial or fanciful reasons, these facts would have supported an inference that he was discharged for union activity, but when the real facts of the discharge appear, these facts are stripped entirely of probative force. For it is settled by the decisions that membership in a union is not a guarantee against discharge, and that when real grounds for discharge exist, the management may not be prevented, because of union membership, from discharging for them.

The evidence as to Mercer's discharge, as set out in the Board's findings, completely contradicts the conclusion that he was discharged because of his union membership and the facts as the record shows them are even stronger. Mercer had been active in the union for many months, in fact, he was an organizer by nature. He had first tried to organize the plant under the auspices of the A. F. of L., and had then turned to the C. I. O. when the A. F. of L. did not press its campaign. But the company took no action whatever against him on account of his activities, and it discharged him more than six months later, only when, instead of discharging his duties as he was ordered to do, he refused to do so and undertook to direct the management of the plant, as to how they should be discharged. A more flagrant case of open insubordination, a clearer case of breakdown of discipline, if the management had not discharged him, could hardly be imagined.

As to the nine employees evicted by their co-employees, the evidence is quite clear that the management, caught in a tempera-mental tempest between groups of its women employees, did everything it could to reasonably compose and allay it. It counseled the employees not to make union membership a cause of friction, it offered to take the evicted ones back and protect them, but the evicted employees refused to return unless the management would not only take them back, but pay them for time lost since their eviction from the plant, an occurrence for which the management was in no wise responsible.

We hold therefore as to the cease and desist order that it should be modified by adding to (a), a clause of the nature of that hereinabove suggested; by striking from Clause (b) all of it after "organization of its employees" in the third line; and by striking Clauses (c) and (d) and (e), (e) because too general and beyond the scope of the complaint and findings; and that as thus modified it should be ordered enforced. We hold as to Section 2, providing for affirmative action, that Clause (a) thereof be amended as provided for Clause (a) of Section 1; that Clauses (b) and (c) be stricken; that Clauses (d), (e) and (f) be enforced as written. Let a decree in accordance herewith be presented for entry.