**RAILROAD COMMISSION of Texas et al.,**
**Appellants,**

**v.**

**Clark SAMPLE, Jr., et al., Appellees.**

**No. A–10958.**

Supreme Court of Texas.

June 15, 1966.

Rehearing Denied July 20, 1966.

Houston, Charles Heidrick, E. M. Cage and Granville Dutton, Dallas, McGinnis, Lochridge, Kilgore, Hunter & Wilson, B. D. St. Clair, Austin, for appellants.

Clark, Thomas, Harris, Denius & Winters, James H. Keahey, Austin, for appellees.

WALKER, Justice.

After notice and hearing the Railroad Commission of Texas issued its Special Order No. 6–52,584 dated May 24, 1965, requiring Clark Sample, Jr., as operator of the Caddie Fisher Lease in the East Texas Field, to make up out of future allowables 58,061 barrels of oil found by the Commission to have been overproduced from wells on the lease. This suit was brought against the Commission by Sample and other owners of the working interest in the lease to set aside the order and enjoin its enforcement. A number of operators in the East Texas Field intervened and aligned themselves with the Commission. The trial court rendered summary judgment declaring the order void and permanently enjoining its enforcement, whereupon the Commission and the intervenors prosecuted a direct appeal to this Court as authorized by Article 1738a.[1]

■ Appellees have not controverted the facts set out in the answer to their motion for summary judgment and the affidavits attached to the answer. All of such facts must be accepted as true, therefore, for the purpose of this appeal. Nineteen wells were located on the Caddie Fisher Lease when appellees began operating the same on or about January 1, 1961. These wells are designated as Nos. 1 to 10, 12 to 16, and 18 to 21, inclusive. At the time appellees acquired the lease, it was producing an average of 380 barrels per day. It had been producing that amount of oil daily since 1952. Shortly after appellees began operating the lease, the pro-

Waggoner Carr, Atty. Gen., Austin, J. Arthur Sandlin, Linward Shivers, C. Daniel Jones, Jr., Asst. Attys. Gen., John S. Miller and Thomas W. Lynch, Tulsa, Okl., Cecil C. Cammack, Alfred O. Holl, Robert F. LeBlanc, Bartletsville, Okl., K. C. Minter,

1. Except as otherwise indicated all statutes are referred to by the article number under which they appear in Vernon's Annotated Texas Civil Statutes.

duction therefrom increased to approximately 1,000 barrels per day. This increase was due, in part, to the fact that Sample filed test reports for Wells Nos. 6, 8, 9, 15, 16, 18, 19, 20 and 21, hereinafter referred to as the old marginal wells, and on the basis of such reports these nine wells were reclassified from top allowable to high marginal wells. As a result the allowables of such wells more than trippled and the aggregate production therefrom increased from some 49 barrels per day to about 150 barrels per day. After tests were made by the Commission in October, 1962, the nine wells were returned to a prorated status with an aggregate daily allowable of approximately 49 barrels. Appellees have not been ordered to make up for any oil produced by virtue of the increased allowables assigned to the nine old marginal wells during the time they were classified as such.

The increase in production from the lease shortly after it was acquired by appellees is not attributable entirely to the increased allowables assigned to the nine old marginal wells. Appellees also drilled and completed eight new wells, which are designated as Nos. 11–A, 17–A, and 22 to 27, inclusive. These new wells were tested by Sample, who reported them to the Commission as high marginal wells with a capacity of from 10.40 to 15.79 barrels each per day. Appellees also tested old Well No. 10, and reported it to the Commission as a high marginal well with a capacity of 17.92 barrels per day. The allowables of the eight new wells and Well No. 10, hereinafter referred to as the nine dummy wells, were accordingly set by the Commission at correspondingly high marginal levels, aggregating approximately 125 barrels per day.

A test run by Commission personnel in October, 1962, disclosed that the aggregate potential of the eight new wells was 9.53 barrels per day, and that the potential of Well No. 10 was zero. Another test made eight months later showed that the total capacity of the nine dummy wells was 14.40 barrels per day. Experts concluded from all the available data that the combined capabilities of the nine dummy wells had never exceeded 16 barrels per day since January, 1961. Despite the fact that nine of the wells were incapable of producing their schedule allowables, appellees had produced from the Caddie Fisher Lease oil in an amount substantially equal to the allowables assigned to all of the wells. It thus appeared that the capable wells on the lease had produced the allowables assigned to them and most of the allowables assigned to the dummy wells. This was in violation of Statewide Rule 52, which provides *inter alia* as follows:

"(A) The daily allowable production of any lease or property shall not include production based upon the daily potential production of any well entitled to a share in the allowable production of the field or area in which such well is located unless such well is actually on production, and such lease or property shall share in the total allowable production of the field or area, only to the extent of such well's actual ability to produce from day to day regardless of the rated potential production thereof according to the Commission schedules."

When the facts set out above were brought to the Commission's attention, it ordered a hearing at which Sample and other interested parties appeared. Special Order No. 6–52,584 was issued about eighteen months later. Appellees have attacked this order upon three grounds, contending: (1) that they were denied procedural due process in the hearing before the Commission; (2) that the order is an attempt to impose a penalty for filing false reports because the lease was not overproduced according to the Commission's allowable schedules and findings; and (3) that the Commission has no authority to require an operator to make up overproduction. The relevant provisions of the

notice of hearing and order are quoted in the margin.[2]

■ Appellees say that they were denied procedural due process in that the Com-

2. "NOTICE OF HEARING GIVING AN OPPORTUNITY TO CLARK SAMPLE, JR., TO SHOW CAUSE WHY HE SHOULD NOT BE REQUIRED TO MAKE UP OVERPRODUCTION ACCRUED FOR HIS CADDIE FISHER LEASE, J. RUDDLE SURVEY GREGG COUNTY, EAST TEXAS FIELD, TEXAS

"WHEREAS, From time to time during the recent slant hole investigation in the East Texas Field, the Commission has had good cause to review conditions on the Clark Sample, Jr., Caddie Fisher Lease in the J. Ruddle Survey, Gregg County, in the East Texas Field of Texas; and

"WHEREAS, The Commission investigation resulted in the discovery of:

1) Five (5) wells to be deviated from a vertical projection of their surface location as follows:

\* · \* \* \* \*

[Wells Nos. 16, 18, 19, 20 and 21 and their deviations listed]

\* \* \* \* \*

and which also had been shown by sworn tests made by or on behalf of the operator thereof to be high marginal wells (i. e., 15.5 to 16 barrels per day) when in fact each such well's capability exceeded the amount needed to cause classification as a proratable well and subject to market demand limitation.

2) Nine (9) wells; namely, Wells Nos. 10, 11–A, 17–A, 22, 23, 24, 25, 26 and 27 to be straight holes at surface locations that were at or beyond the apparent limits of production for the East Texas Field, and which had been shown by sworn tests made by or on behalf of the operator thereof to have productive capacity far in excess of the capability of such wells as shown on recent Commission tests.

3) Four (4) wells; namely, Wells Nos. 6, 8, 9, 19 to be straight holes within the limits of production for the East Texas Field, which had been shown by sworn tests made by or on behalf of the operator thereof to be high marginal wells (i. e., 15.5 to 17.5 barrels per day) when in fact each such well's capability exceeded the amount needed to cause classification as a proratable well and subject to market demand limitation.

4) Nine (9) wells; namely, Wells Nos. 1, 2, 3, 4, 5, 7, 12, 13, and 14 were properly completed, tested, and on the schedule with a proper prorated allowable.

"WHEREAS, It appears to the Commission that Clark Sample, Jr., on or about January 1, 1961, took over the operation of the Caddie Fisher lease and proceeded thereafter to raise the monthly producing rate from such lease from a top of 3420 barrels per month to a top of 10,474 barrels . . . : that in November, 1962, after the slant hole investigation and production tests were made the monthly producing rate return to the approximate rate established prior to the excessive rate period experienced during the January, 1961, to October, 1962, period; and

"WHEREAS, The Commission caused a study to be made for that excessive rate period, with consideration to be given to requiring such excess production to be made up as overproduction, and it was determined that a volume in excess of 100,-000 barrels of oil should be considered overproduction, subject to make up from the Caddie Fisher Lease.

"THEREFORE, NOTICE IS GIVEN To the public and all interested parties that the Railroad Commission of Texas will hold a Hearing at \* \* \* to give an opportunity to Clark Sample, Jr., to appear and show cause why he should not be required to make up the above-described overproduction or any part thereof. \* \* \*

"A tabulation of monthly allowables, monthly production, and estimated overproduction is placed in the Hearing File for consideration of the interested parties, but it is not to be considered as a limitation on the Commission to make changes in such estimates after consideration of the evidence that may be adduced into the record of such Hearing.

"PURSUANT To said Hearing, The Commission will enter such rules, regulations, and orders as in its judgment the evidence presented may justify."

\* \* \*

"SPECIAL ORDER REQUIRING OVERPRODUCTION ACCRUED FOR THE CLARK SAMPLE, JR., CADDIE FISHER LEASE (07884) EAST TEXAS FIELD, GREGG COUNTY, TEXAS TO BE MADE UP BY UNDERPRODUCTION

"WHEREAS, The Commission, after a review of conditions on the Clark Sample, Jr., Caddie Fisher Lease \* \* \* concluded that there existed a possibility that such lease was overproduced in excess of 100,000 barrels of oil, and that such mat-

mission made its finding of guilt prior to the hearing and required them to assume the burden of proving their innocence. In support of this contention they point

ter should be set for hearing to give such operator an opportunity to appear and show cause why he should not be required to make up any overproduction shown to have been made on such lease * * *; and

"WHEREAS, After due notice, the Railroad Commission of Texas held a hearing on December 19, 1963, to give Clark Sample, Jr., an opportunity to show cause why he should not be required to make up overproduction accrued for his Caddie Fisher Lease, J. Ruddle Survey, East Texas Field, Gregg County, Texas; and

"WHEREAS, From evidence adduced at said hearing, it appeared that overproduction did exist on such lease; that such overproduction involved at least 57,876 barrels of oil that were produced in excess of that to which the operator was entitled; that such excess production was overproduction made from wells completed on the lease and shown to be on Commission records to be producing from the East Texas Field reservoir; that such overproduction could be greater in volume, probably as much as 120,737 barrels of oil, as shown by the operator's own calculations (Sample Exhibit No. 70) than the volume established by the Commission; that such overproduction if not made up gives a greater share of production from the reservoir than the operator's fair share, to the detriment of all other interests in the field, including those parties who intervened at the hearing as interested parties; that overproduction when made up will have restored to the interested parties, including the interest holders in the Caddie Fisher Lease, the opportunity to produce his fair share of the allowed production for the field; and

"WHEREAS, From evidence adduced at said hearing, it is apparent to the Commission that after January 1, 1961, the date Clark Sample became operator, development and production operations on the Caddie Fisher Lease were conducted in such manner that production from the lease was raised from a relatively static 3420 barrels of oil per month to a rate of approximately 10,474 barrels of oil per month; that in October, 1962, when the Commission made a thorough investigation of the lease which included individual well deviation and well status (productive capability) tests the lease returned to the approximate level of allowed production existing at the time Clark Sample became operator; that such increased production was the product of incorrect testing procedures and allowable assignments based thereon; that the overproduction is determined to be the difference between the test volumes for certain wells, and the allowable volumes for such wells that were set by the filing of incorrect testing reports; and

"WHEREAS, The Commission is of the opinion and finds that the Clark Sample, Jr., Caddie Fisher Lease wells each had the following test and allowable history as shown by Commission records as Exhibit 'A'.

* * *

"1, Wells Nos. 1, 2, 3, 4, 5, 7, 12, 13 and 14 were tested and reported as top allowable wells and were prorated as top allowable wells showing no evidence of incorrect testing and reporting.

"2. Wells Nos. 6, 8, 9, 15, 16, 18, 19, 20 and 21 were tested and had assigned allowables on the Commission proration schedule as proratable wells until 30 day marginal tests were taken on such wells, and filed with the Commission at various times subsequent to January 1, 1961, for the purpose of acquiring marginal exempt status. Such wells on retest in October, 1962, without benefit of workover operations showed producing capabilities in excess of marginal classification qualification and were therefore returned to prorated status. This group of wells evidencing characteristics of top producing wells both before and after the marginal status period are at least questionable of incorrect testing and reporting to gain allowable advantage, but due to the difficulty in conclusively proving the questionable condition, the Commission could not declare any production from such wells during the period in question to be overproduction.

"3. Wells Nos. 11–A, 17–A, 22, 23, 24, 25, 26 and 27 were completed as new wells subsequent to January 1, 1961, and were assigned high marginal allowables after 30 day marginal tests were taken on such wells, and filed with the Commission for the purpose of establishing initial marginal exempt status. Such wells on retest in October, 1962, showed very small or no producing capability, thereby being subject to overproduction determined as the difference between the allowable set on the proration schedule and the actual capability of each such well.

to the notice of hearing with its recital that "it was determined that a volume in excess of 100,000 barrels of oil should be considered overproduction." The notice also states that a hearing would be held "to give an opportunity to Clark Sample, Jr., to appear and show cause why he should not be required to make up the above-described overproduction or any part thereof." Appellees argue that the notice in this form plus the fact that they were called upon to present their evidence first at the hearing show that the Commission had prejudged the case. They made no objection to the procedure followed at the hearing, and did not claim that they were being denied due process until after the evidence was closed.

The use of the so-called show cause notice is a familiar practice in many types of court proceedings and administrative hearings. See Rules 308–A and 692, Texas Rules of Civil Procedure; Article 21.21, Section 6, and Article 21.07, Section 4, V.A.T.S. Insurance Code; Article 666–7, V.A.P.C. This type of notice is also frequently issued in temporary injunction, temporary alimony, child support, and other proceedings where its use is not specified by either statute or rule. In all of these situations it is generally recognized that the form of the notice has nothing to do with the burden of persuasion at the hearing. The mere fact that a show cause notice was used in this instance does not, in our opinion, tend to establish that the Commission placed the burden of proof upon appellees.

The other recital quoted above and the fact that appellees were called upon by the Hearing Examiner to introduce their evidence first may be somewhat more persuasive, but these circumstances are not conclusive. The recital probably had reference to a preliminary determination by employees of the Commission, and there

"4. Well No. 10 was carried on the Commission proration schedule as a proratable well until a 30 day marginal test was taken on such well and filed with the Commission subsequent to January 1, 1961, for the purpose of acquiring marginal exempt status. Such well on retest in October, 1962, showed producing capability to be at a very low rate, thereby being subject to overproduction determined as the difference between the allowable set on the proration schedule and the actual capability of the well.

"WHEREAS, From evidence and testimony adduced into the record and from a study of its own records for the individual wells the Commission concluded that the Clark Sample, Caddie Fisher Lease is overproduced in a total volume of 58,061 barrels of oil; that such total volume has been produced from said lease by virtue of incorrect testing and reporting so that each of the hereafter named wells is charged with overproduction of the stated volume of oil.

| WELL NO. | NO. OF BARRELS | WELL NO. | NO. OF BARRELS |
|---|---|---|---|
| 10 | 7,697 | 23 | 8,728 |
| 11–A | 6,080 | 24 | 5,600 |
| 17–A | 7,261 | 25 | 6,033 |
| 22 | 6,138 | 26 | 7,143 |
| | | 27 | 3,381 |

"WHEREAS, The Commission is of the opinion that the correlative rights of all parties owning an interest in the East Texas Field have been adversely affected by the overproduction of the subject lease, and that the only relief that will protect those correlative rights and restore to those adversely affected parties the interest to which they are entitled is afforded by restriction of the actual production from the lease until such time as the overproduction is balanced out by underproduction; that by law the Commission has the authority, the responsibility, and the duty to promulgate and administer its conservation regulation with due regard for the protection of those correlative rights; that the Commission would be remiss should it fail to order the balancing out of the determined overproduction to protect the correlative rights of the parties in the field.

"THEREFORE, IT IS ORDERED By the Railroad Commission of Texas that the Clark Sample, Jr., Caddie Fisher Lease (07884), East Texas Field, Gregg County, Texas, be and it shall be operated for a period of time in the future in such manner that 58,061 barrels of oil found to be overproduced shall be made up by underproduction.

"Each proratable well on such lease shall be produced at 50% of its allowed rate, and runs to market from these wells will be restricted to 50% of the allowed production until the mentioned volume of overproduction is balanced out."

is no rule which places the burden of proof upon a party who proceeds first at an administrative hearing. An examination of the Commission's order suggests to us, moreover, that appellees were not required to assume the burden of persuasion. It is introduced by a statement that the Commission had concluded that "there existed a possibility that such lease was overproduced in excess of 100,000 barrels of oil, and that such matter should be set for hearing to give such operator an opportunity to appear and show cause why he should not be required to make up any overproduction shown to have been made on such lease." The order further recites that "from evidence adduced at said hearing, it appeared that overproduction did exist on such lease." Even more convincing is the stated conclusion of the Commission that "due to the difficulty in conclusively proving the questionable condition," it could not declare any production from the old marginal wells to be overproduction. This is an appeal from a summary judgment, and it is our opinion that the present record does not show as a matter of law that the Commission prejudged the case or placed the burden of proof upon appellees. Their first ground of attack upon the Commission's order affords no basis then for upholding the summary judgment.

In contending that the order is an effort to impose a penalty for filing false reports, appellees seek to bring themselves within the rule of Harrington v. Railroad Commission, Tex.Sup., 375 S.W.2d 892. It was held there that the sanctions and penalties expressly provided by the Legislature for violations of the conservation laws, or the rules, regulations and orders of the Commission promulgated thereunder, are exclusive and that the Commission has no power to impose different or additional sanctions or penalties of its own devising. At the conclusion of the opinion we pointed out that to restrict production where there had been no overproduction would constitute an unauthorized penalty, but the question

of whether the Commission might require an operator to make up for overproduction was expressly reserved.

Appellees insist that there is no overproduction here. They point out that the Commission found that the nine dummy wells were "subject to overproduction determined as the difference between the allowable set on the proration schedule and the actual capability of such well." It also found that Wells Nos. 1, 2, 3, 4, 5, 7, 12, 13 and 14, hereinafter referred to as the nine old prorated wells, showed "no evidence of incorrect testing and reporting," and that it "could not declare any production from * * * [the nine old marginal] wells during the period in question to be overproduction." Appellees argue, therefore, that the order is predicated on a finding of overproduction by the nine dummy wells and is not based upon overproduction by any other well on the lease. Since none of the dummy wells produced more than its schedule allowable and the lease has not produced more than the aggregate schedule allowables of the wells thereon, appellees say they were not ordered to make up oil found to have been produced in excess of allowables but were assessed a penalty for filing false reports. We do not agree.

■ In the first place it is clear, on the present record at least, that the lease was overproduced. Under the provisions of Statewide Rule 52, appellees were entitled to produce the allowables assigned to the dummy wells only to the extent of the actual ability of such wells to produce the same. The portion of such allowables which the dummy wells were incapable of producing was produced by other wells on the lease. Appellees thus produced more than their share of the field allowable as determined by the Commission's allowable schedules and the rules governing their application. This is overproduction.

■ It also seems clear to us that such overproduction is the basis of the order

now under attack. A reading of numbered Paragraphs 3 and 4 shows that when the Commission stated that the dummy wells were "subject to" and "charged with" overproduction, it did not mean that the overproduction came from such wells. The order recites several times in different ways that the lease was overproduced, but it does not purport to specify the well or wells which produced the excess. It is apparent, however, that the Commission was of the opinion that the overproduction came from the nine old prorated wells. The statement in numbered Paragraph 1 that these wells showed no evidence of incorrect testing and reporting obviously refers to the testing and reporting of their capacities and declinations. This is not a finding that the production therefrom did not constitute overproduction. In numbered Paragraph 2, however, the Commission stated that it could not declare any production from the old marginal wells to be overproduction. Since numbered Paragraphs 3 and 4 show that the dummy wells were not capable of producing their own allowables, the Commission must have concluded that the excess oil was produced from the nine old prorated wells. It thus appears that the order simply requires appellees to make up for overproduction, and the case is not ruled by *Harrington*.

Turning now to appellees' third ground of attack, the Attorney General in 1939 expressed the opinion that the Commission had no power to require an operator to make up overproduction. This opinion was based generally upon the premise that the conservation laws had created new rights and provided remedies for their enforcement, and that the statutory remedies are exclusive. The opinion has been renounced by the present Attorney General, and has not been followed by the Commission for at least 15 years. During that period many operators have been required to make up for overproduction; presently there are 28 operators making up a total of over 390,000 barrels of overproduction from 41 leases. We have concluded that

the administrative practice in this respect is authorized by law, and that the early opinion of the Attorney General is unsound.

■ Section 7 of Article 6049c authorizes and requires the Commission to "distribute, prorate, or otherwise apportion or allocate, the allowable production among the various producers on a reasonable basis." This broad grant of authority includes the power to make reasonable adjustments in the allowable of a well or lease to compensate for prior overproduction therefrom. When that is done, as in this case, the Commission does not impose a sanction or levy a penalty but merely restricts actual production to the amount the operator is authorized to produce in accordance with the allowables applicable to his wells. Correlative rights are thus protected, and the operator is deprived of nothing to which he is legally entitled. On the basis of the facts now before us, we hold that the Commission did not exceed its statutory authority in requiring Sample to make up the 58,061 barrels of overproduction from the lease.

The judgment of the district court is reversed, and the cause is remanded to that court for further proceedings.

### DISSENTING OPINION

SMITH, Justice.

I respectfully dissent. The Commission contends that the order under attack is not a penalty; that the order merely restricts Clark Sample from producing more oil than he is entitled to. The Commission says there is a "big distinction between a restriction and penalty." It is the Commission's position in this case that "under the statutory duties and obligations and the guidelines set down by this * * * [Supreme Court] that the Commission must not only prorate oil to prevent waste but must also prorate and restrict the production of oil to protect the correlative rights of all operators in an oil field."

The appellees, Clark Sample et al., filed this suit on June 3, 1965, against the Railroad Commission of Texas and its members. On June 17, 1963, the Commission filed its answer alleging that Order No. 652,484, dated May 24, 1965, (the order involved) was not a penalty against Sample et al., but was an attempt to adjust correlative rights in the East Texas Field. The Commission alleged that:

"* * * after January 1, 1961, the date Clark Sample became operator, development and production operations on the Caddie Fisher Lease were conducted in such manner that production from the lease was raised from a relatively static 3420 barrels of oil per month to a rate of approximately 10,474 barrels of oil per month; that in October, 1962 when the Commission made a thorough investigation of the lease which included individual well deviation and well status (productive capability) tests the lease returned to the approximate level of allowed production existing at the time Clark Sample became operator; that *such increased production was the product of incorrect testing procedures and allowable assignments based thereon*; that the overproduction was determined to be the difference between the tests volumes for certain wells, and the allowable volumes for such wells that were set by the filing of incorrect testing reports, * * *." [Emphasis added.]

On June 4, June 7 and July 8, 1965, the Sun Oil Company, the Amerada Petroleum Company, the Humble Oil and Refining Company and the Cities Service Oil Company filed petitions in intervention. Each intervenor alleged that at all material times it owned various interests in a number of oil and gas leases covering lands in the East Texas Field; that each was an operator of leases in said field and as such was an interested party and affected by the order under attack and "will be affected by any orders of this Court relating to said Railroad Commission Order."

On June 18, 1965, plaintiffs, Clark Sample et al., appellees here, filed a motion for summary judgment pursuant to Rule 166-A, Texas Rules of Civil Procedure. Plaintiffs-appellees moved the Court to enter summary judgment setting aside and declaring invalid the order dated May 24, 1965, "assessing a penalty of 58,061 barrels of oil against plaintiffs' Caddie Fisher Lease."

On July 19, 1965, the trial court granted the motion for summary judgment and entered its judgment decreeing that the order was void and permanently enjoined the Commission, its members and employees from enforcing said order.

The motion for summary judgment was properly sustained. The Commission's order shows on its face that the Commission charged the 58,061 barrels of oil back against Sample's Caddie Fisher Lease not because it was overproduction, but for "filing incorrect test reports." The recitations contained in the order lead to the conclusion that "the Clark Sample, Caddie Fisher Lease is overproduced in a total volume of 58,061 barrels of oil; that such total volume has been produced from said lease by *virtue of incorrect testing and reporting.* * * *" [Emphasis added.] The order recites that the Commission made findings relative to test and allowable history of each of the 27 wells on the Caddie Fisher Lease. Then the order recites that the overproduction was charged to nine of those wells: wells 10, 11-A, 17-A, 22, 23, 24, 25, 26 and 27. Clark Sample was not charged with overproduction of these individual wells, but according to the "Notice of Hearing," the Commission had predetermined that the Caddie Fisher Lease was being overproduced. At the hearing, the Commission's preliminary finding was conclusively disproved. There was no overproduction from the lease as a whole in excess of the Commission-set allowable. On the other hand, the undisputed evidence shows that the Caddie Fisher Lease was underproduced during the relevant period by 2,322 barrels

below the allowables set for the wells on the lease by the Commission. Sample's testimony is undisputed that "during the entire period involved in this show cause hearing, * * * we underproduced this lease by 2,322 barrels below the allowables set by the Commission." The evidence clearly affords the basis for the statement in Sample's motion for summary judgment that "the fact is, as stated in Plaintiffs' sworn original petition, that Plaintiffs' Caddie Fisher Lease was not overproduced during the period January 1, 1961—November 1, 1962, according to the Commission's allowable schedule. The Commission, by its allowable schedules, authorized Plaintiff to produce every drop of this 58,061 barrels of oil." The overproduction which the Commission found in its order was not overproduction in the sense that there was production in excess of allowables. "Overproduction" as used in the Commission's order is not given this commonly accepted meaning. The order defines "overproduction" as follows:

" * * * Overproduction is determined to be the difference between the test volumes for certain wells, and the allowable volumes for such wells that were set by the filing of incorrect testing reports."

Thus, it is seen that the Commission in using this artificial definition as a guideline actually made no finding in its order of overproduction by the nine wells, as overproduction is ordinarily understood. I respectfully submit that this Court cannot successfully demonstrate that the Commission did, in fact, determine whether these nine wells produced more or less than their allowables. The only finding is that Sample obtained increased allowables by filing "incorrect testing reports" and the Commission chose to label this as "overproduction." Clearly, the Commission's order is a penalty order. It is not based upon any true finding of overproduction, either on a lease basis or an individual well basis. I agree with Sample's argument that:

"[r]ather it [the order] is a penalty assessed against Appellees [Sample et al.] for filing what the Commission says were false test reports. The penalty is arbitrarily set by applying the production levels which Wells 10, 11-A, 17-A, 22, 23, 24, 25, 26 and 27 had in October, 1962, *retroactively*; i. e. by an ex post facto revision of the allowables which the Commission had previously set for these wells during the period January, 1961—October, 1962."

Obviously, the Commission has assessed a penalty against Sample et al. for illegal production. In other words the Commission has found that Sample et al. committed an illegal act, when, in fact, they did not. (The Commission now claims that its action should be tested by the substantial evidence rule. The Court fails to deal with this contention, but it will be dealt with later in this dissent.) It is clear that Sample et al. were penalized not for producing in excess of scheduled allowables, but for obtaining increased allowables through tests and reports which the Commission considers to be false. While the Commission is not empowered to devise its own penalties for unlawful conduct or for violation of its rules and regulations, it is not powerless when it finds that an operator has been filing false reports. This Court pointed out in Harrington v. Railroad Commission, Tex.Sup.Ct., 375 S.W.2d 892 (1964), that the correct procedure in a situation such as the Commission found existed here was for the Commission to request the Attorney General to bring a penalty suit under Article 6036, Vernon's Annotated Texas Civil Statutes.

The Commission simply has no power to shut in wells or require make-up production—whether such illegal production was obtained through trespassing wells (as in the Harrington case) or through "filing incorrect testing reports" as to the productive capacity of wells, as is charged in this case. We said in Harrington that the State's authority to penalize an operator is limited to the sanctions set out by the

Legislature. This Court in Harrington discussed the Articles of the Statutes which expressly provide the sanctions and penalties which may be imposed for violating the conservation laws or the rules, regulations and orders of the Commission promulgated thereunder. We discussed the applicable provisions of Articles 6033, 6036, 6066a and Article 1111c, Sec. 2, Vernon's Annotated Penal Code, and held:

"The sanctions and penalties thus expressly provided by the Legislature are exclusive, and the Commission has no power to impose different or additional sanctions or penalties of its own devising. The power is necessarily denied to the Commission by Art. 3, Vernon's Ann. Penal Code, which provides that 'no person shall be punished for any act or omission, unless the same is made a penal offense, and a penalty is affixed thereto by the written law of this State', which provision implements the design of the Penal Code declared in Article 1 to be 'to define in plain language every offense against the laws of this State, and affix to each offense its proper punishment.' "

I think the Harrington case supports Sample's position here. In the Harrington case this Court said there was "no evidence of overproduction." It is my contention that there is no evidence of overproduction in this case, and the order is not based on a finding of overproduction. It is based on a finding of the filing of false reports. Whether the facts justified the order or not, the Commission has no statutory power to assess what clearly is an unauthorized penalty. In addition to the penalties provided by statute, the Commission has assessed a penalty which in dollars and cents amounts to $174,000, the value of 58,061 barrels of oil.

Assuming arguendo that we have an "overproduction" case, I still maintain that "overproduction" means production in excess of the Commission-set allowable. Overproduction of oil in excess of allowable is a felony under Article 1112b, Section 7a,[1] Vernon's Annotated Penal Code. Section 9 of Article 1112b provides that any person who shall violate the provisions of Section 7a " * * * shall upon conviction be deemed guilty of a felony, and upon conviction shall be punished by confinement * * *." I think the Legislature realized that these penal statutes would be calculated to effectively deter persons from attempting to produce from oil properties under their control oil in excess of the amount lawfully allowed to be produced. The purpose of these penal statutes is not only to punish the offender, but to deter others from committing like offenses. On the other hand, the order under consideration recites that the "Commission is of the opinion that the correlative rights of all parties owning an interest in the East Texas Field have been adversely affected * * *", yet, the Commission makes no effort to determine the correlative rights of all of the owners in the field. We find that four major oil companies have intervened. May I ask what disposition is the Railroad Commission going to make of this oil? Will this matter be adjudicated in another law suit or can the adjustment of correlative rights be made as though only the four major oil companies have been affected? I raise these questions to point up the untenable position of the Commission and the intervenors.

Assuming overproduction, the Commission has no power to require make-up of past overproduction out of future production. There is no statute applying to *oil* production comparable to Article 6008, Section 14, which applies only to *gas*. The

---

1. "It shall be unlawful for any person, as defined in this Act, owning, leasing, operating, producing, or controlling any oil property or oil well within this State to produce or cause to be produced on any day from any such oil property or oil well any oil in excess of the amount allowed to be produced per day from any such oil property or oil well under any order or orders of the Governmental Agency, theretofore promulgated and in force at the time."

Attorney General relies on Section 7 of Article 6049c for statutory authority. I do not find any provision in Section 7 or in any other statute under Title 102, Oil and Gas, which authorizes the Commission to adjust or restrict future *oil production* to make up for past overproduction. Article 6008, Section 14 limits the Commission's make-up-for-overproduction power to *gas*. I contend that the Commission had no statutory authority to enter the involved order. I concede that the Commission is empowered to make initial allocations among producers and to prorate production to prevent waste, but the Commission is wholly without power to adjudicate charges of violations and, in effect, reallocate to compensate for overproduction.

This leads me to consider the contention of the Commission that we have a case where there is not involved punishment or penalty for crime and that the concept of burden of proof, as argued by Sample et al. has no application whatsoever to a Railroad Commission hearing where the test of validity is whether the order is supported by substantial evidence. The Commission in its answer to the motion for summary judgment says that "[h]ere, the Railroad Commission simply reviewed certain factual data relating to production history, allowable assignments, and well capability test reports filed by the operator as compared to those conducted by the Commission and called a hearing of all interested parties, giving them an opportunity to present any evidence bearing on the subject. At the hearing the basic facts were undisputed, and these facts were sufficient to prove that the Sample lease was overproduced by 58,061 barrels. In issuing the present order, the Commission considered all evidence presented. Since the validity of its action must be tested by the substantial evidence rule, the manner by which it initiated the hearing is immaterial." The Commission has taken the position that no constitutional question is involved. I cannot agree with the position of the Commission. If the Court maintains its present position and finally holds that the Commission has the statutory authority to assess penalties as an alternative to a suit by the Attorney General, then the Court should require the same procedural safeguard as required of the Attorney General in a penalty suit brought under Article 6036, supra. The Commission's (Penalty) Order is invalid as a matter of law in that it is the result of an administrative hearing prior to which the Plaintiff, Sample, was presumed guilty and put under the burden of "show[ing] cause why he should not be required to make up the above described overproduction. * * *" The procedure followed in this case offends due process. If the Attorney General had sought the sum of $174,000, the value of the 58,061 barrels of oil, as penalties in a District Court action under Article 6036, supra, or if proceedings were instituted under the proper Article of the Penal Code, the State would have had the burden of proof and Sample would have been presumed innocent of any wrongdoing until proven guilty by a preponderance of the evidence in proceedings under Article 6036, supra, and would have been presumed innocent until proven guilty beyond a reasonable doubt, if proceedings were under a proper penal code. Sample's motion for summary judgment clearly states the effect of a shifting of the burden of proof at the administrative level. The motion contains the following unanswerable argument:

"That due process can be denied by a shifting of the burden of proof at the administrative level was emphasized by the United States Supreme Court in Speiser v. Randall, 357 U.S. 513, 78 S.Ct. 1332 [2 L.Ed.2d 1460] (1958) in these words:

"'In all kinds of litigation it is plain that where the burden of proof lies may be decisive of the outcome. Cities Service Oil Co. v. Dunlap, 308 U.S. 208, 60 S.Ct. 201, 84 L.Ed. 196; United States v. New York, N.H. & H.R. Co., 355 U.S. 253, 78 S.Ct. 212, 2 L.Ed.2d 247; Sampson v. Channell, 1 Cir., 110 F.2d 754, 758, 128 A.L.R. 394. There is always in litiga-

tion a margin of error, representing error in factfinding, which both parties must take into account. Where one party has at stake an interest of transcending value —as a criminal defendant his liberty— this margin of error is reduced as to him by the process of placing on the other party the burden of producing a sufficiency of proof in the first instance, and of persuading the factfinder at the conclusion of the trial of his guilt beyond a reasonable doubt. Due process commands that no man shall lose his liberty unless the Government has borne the burden of producing the evidence and convincing the factfinder of his guilt. Tot v. United States, supra [319 U.S. 463, 63 S.Ct. 1241, 87 L.Ed. 1519]. Where the transcendent value of speech is involved, due process certainly requires in the circumstances of this case that the State bear the burden of persuasion to show that the appellants engaged in criminal speech. Cf. Kingsley Books, Inc., v. Brown, supra [354 U.S. 436, 77 S.Ct. 1325, 1 L.Ed.2d 1469].

" ' * * *

" 'Accordingly, though the validity of § 19 of Art. XX of the State Constitution be conceded *arguendo*, its enforcement through procedures which place the burdens of proof and persuasion on the taxpayer is a violation of due process.'

"To the same effect is the very recent United States Supreme Court decision in Armstrong v. Manzo, 33 U.S. Law Week 4349 [380 U.S. 545, 85 S.Ct. 1187, 14 L.Ed. 2d 62] (April, 1965). These decisions echo earlier holdings by the 5th Circuit in Magnolia Pet. Co. v. N.L.R.B., 112 F.2d 545 (5th Cir. 1940) and N.L.R.B. v. Riverside Mfg. Co., 119 F.2d 302 (5th Cir. 1941) in both of which Judge Hutcheson wrote:

" 'In its capacity as accuser, the Board, under the genius of our institutions, is held to the same burdens and obligations of proof as any other litigant who takes the affirmative. It may not by accusing put the accused upon proof. As accuser it must prove its charge.

" 'In its capacity as a trier of facts, the Board stands on the footing of a jury. Like a jury it must be impartial. Like a jury, it may not make findings without evidence to support them and as in the case of a jury, it is for the courts to say whether there is or is not evidence in support.'

"The shifting of the burden of proof at the administrative level in the present case can be sustained only if Plaintiffs are to be given a complete *de novo* review of the Commission's Penalty Order in this Court. If this appeal is to be under the Substantial Evidence Rule, then clearly, Plaintiffs have never had the day in court that due process demands. The Commission's procedure renders its Penalty Order void."

I respectfully submit that the trial court's summary judgment should be affirmed on the primary ground that the Commission Order under attack is a Penalty Order and is such an order as was beyond the Commission's legal power to enter. If necessary, I would also hold that the order was the result of an administrative hearing prior to which Sample et al. were presumed guilty and was the result of a hearing in which they were shouldered with the burden of proof. The notice to show cause states, the Commission predetermined "that a volume in excess of 100,000 barrels of oil should be considered overproduction, subject to make-up from the Caddie Fisher Lease." Sample et al. were presumed guilty and the hearing was merely "an opportunity to Clark Sample, Jr., to appear and show cause why he should not be required to make up the above-described overproduction or any part thereof." The Commission has no precedent for the procedural course it has taken in this case. It has rejected an opinion written in 1939 by the Attorney General in answer to a question as to "[w]hat remedy does the Railroad Commission have against an operator who has

produced 1500 barrels of illegal oil in violation of the Commission's order?" The Attorney General advised that the Commission could not enter "an order reducing the production from 'A's' well at a subsequent date or during the subsequent month * * * until the amount overproduced comes within or balances with the amount which 'A' can legally produce." The Attorney General quoted at length from the case of Ortiz Oil Company v. Railroad Commission, Tex.Civ.App., 62 S.W.2d 376 (1933), no wr. hist. There was a second question dealt with in the opinion of the Attorney General. That question was: "Or in the above circumstances would the operator simply be subject to criminal prosecution or civil penalties for the violation of the Commission's Order." The Attorney General answered, in part: "As our answer to your first question is no, it follows, as a matter of course, that our answer to your second question is that the operator would be subject to the civil penalties and criminal prosecution provided by statute." The Attorney General then discusses the applicable statutes. This Court, in Harrington, took cognizance of the 1939 opinion of the then Attorney General and analyzed some of the statutes referred to by the Attorney General. While we did say in Harrington that "[w]e need not, and do not, undertake to resolve the *difference* between the Commission and the [1939] Attorney General," it also can be said that we did not repudiate the opinion of the Attorney General. When one reads the Harrington opinion in its entirety, it appears that this Court leaned toward the view expressed by the Attorney General.

I commend the Commission for making every legal effort to protect the public and to see that each operator in a given oil field gets his fair share of the production from that field, but I am compelled to conclude here as did the 1939 Attorney General that the rights and remedies involved were created by statute and did not exist at common law. I further agree that "[w]here a statute creates a new right or

cause of action, as a purely statutory proceeding where none existed at common law, and also provides a remedy for its enforcement, it is ordinarily held that such statutory provisions are mandatory and exclusive." Ortiz Oil Co. v. Railroad Commission, 62 S.W.2d 376, 379 (Tex.Civ.App. 1933, no wr. hist.). See Mingus v. Wadley, 115 Tex. 551, 285 S.W. 1084 (1926).

The summary judgment rendered by the trial court should be affirmed.

The Court's opinion admits of no other construction than the Commission upon another trial will be entitled to a summary judgment. This Court is holding that as a matter of law, based upon the "facts now before us," that the Commission did not exceed its statutory authority in requiring Sample to make up the 58,061 barrels of overproduction from the lease. Sample will be convicted of the offense of filing false reports without a lawful trial of the issue of his guilt or innocence.

The summary judgment should be affirmed.